# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3124

_____

| | | |
|---|---|---|
| Anthony Siers, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Douglas Weber, Warden of the South | * | District of South Dakota. |
| Dakota State Penitentiary; Mark W. | * | |
| Barnett, South Dakota Attorney | * | |
| General, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: February 26, 2001

Filed: August 14, 2001

_____

Before WOLLMAN, Chief Judge, HANSEN, and BYE, Circuit Judges.

_____

WOLLMAN, Chief Judge.

The state of South Dakota appeals from the district court's grant of Anthony Siers's petition for writ of habeas corpus. We reverse and remand with directions to dismiss the petition.

On October 4, 1991, a Pennington County, South Dakota, jury found Siers guilty of second degree rape. As a habitual offender, Siers was sentenced to fifteen years in the South Dakota State Penitentiary. In 1994, after the South Dakota Supreme Court summarily affirmed his conviction, Siers filed a petition for a writ of habeas corpus in the state trial court, which was eventually granted in November of 1997. The South Dakota Supreme Court reversed the grant of habeas relief in July of 1998. Siers v. Class, 581 N.W.2d 491 (S.D. 1998). In November of that year Siers filed a pro se petition for habeas relief in federal district court. After the appointment of counsel, amended pleadings were filed in December of 1999, and on August 10, 2000, the district court granted the petition. The state filed this appeal and obtained a stay of Siers's release pending the outcome of these proceedings.

We recite the facts as determined by the South Dakota Supreme Court. On July 4, 1991, S.B., a college sophomore, went to meet friends at the Black Hills Heritage Festival in Rapid City, South Dakota. S.B. was unable to locate her friends, but met up with a man who followed her around the festival while she looked for them. He identified himself as Tony Siers. S.B. left the festival, planning to walk to a friend's home, and Siers followed her on his bicycle, attempting to persuade her to enter secluded areas with him. Nervous, and forgetting that she had already given him her name, S.B. gave Siers a false name, prompting him to tell her that he had also lied about his real name, which he said was Tom Janis. Siers then tried unsuccessfully to persuade S.B. to accompany him to his home on Silver Street.

Siers eventually convinced S.B. to walk across a dark lot, where he raped her. After the assault, S.B., fearing for her life, agreed to go back to Siers's house with him, but asked to stop at a convenience store. Siers waited outside the store while S.B. used the telephone. Juanita Larvie, the convenience store clerk, overheard S.B. asking a friend to pick her up and take her to the hospital. Larvie elicited from S.B. that she had

been raped. At Larvie's suggestion, S.B. called the police. She asked Larvie to remember the names Tony Siers and Tom Janis and gave both names to the police officer who answered her call.

S.B. took the police to the scene of the rape. Physical and medical evidence generally corroborate S.B.'s account of the rape. Upon visiting the Silver Street address given by S.B., a police detective determined that it was the residence of Siers's mother and that Siers had been living there and at the home of his sister, Joanna Siers. The detective then spoke with Joanna Siers at her home and ascertained that Siers was not there. Joanna Siers was cooperative, but said nothing to the effect that her brother had been at her home at the time of the rape. When he was ultimately arrested at the Silver Street house, Siers said nothing to the arresting officers about having spent the night at his sister's house. S.B. and Larvie both picked Siers's picture out of photographic line-ups, although S.B. had initially described her attacker as having "sandy hair," whereas Siers has black hair, and Larvie, who was acquainted with both Siers and Tom Janis, had initially told police that Tom Janis was the man she saw outside the convenience store.

Attorney David Wurm, who was appointed to represent Siers, called no defense witnesses at trial. According to the testimony presented at the state habeas proceeding, Siers had told Wurm that four witnesses, Loydell and Randy Williams, and Joanna Siers and her boyfriend Forest Bordeaux, could provide an alibi by placing him at a powwow that was going on near the festival, and that he had slept at his sister's home on the night of the rape. Wurm interviewed the Williamses and concluded that because their testimony placed Siers near the scene of the rape and because they could not remember the precise time they saw Siers at the powwow, their testimony would not prove helpful. Wurm went to Joanna Siers's house in an attempt to interview her and Bordeaux, but neither was at home. Wurm subpoenaed Joanna Siers; Bordeaux was, by then, on the Rosebud Sioux Indian Reservation and therefore beyond the reach of the subpoena. Although Wurm could not remember what other steps he took to contact

Bordeaux and Joanna Siers, his normal practice would have been to ask Siers for help in contacting them, to leave his business card in the door when he visited Joanna Siers's home, and to attach a note to the subpoena asking her to contact him. Wurm's telephone number was written on the face of the subpoena, and it is undisputed that Joanna Siers did not contact him prior to the trial.

Both Joanna and Anthony Siers testified at the state habeas proceeding that Joanna responded to Wurm's subpoena by coming to the trial. Wurm stated that he was unaware of Joanna's presence and that he had received no response when he called her name in the hallway outside the courtroom during the course of the trial. Siers alleges that he asked Wurm why no alibi witnesses were called. Joanna Siers testified that she had approached Wurm during the trial and asked him when she would testify and was told that her testimony was not needed. She further testified that Siers was at her home on the night of the rape, that she, Siers, and Bordeaux were awake during the early portion of the two to three hour period prior to the rape, that all three went to bed at the same time, and that because she is a light sleeper, she would have heard Siers if he had left during the night. Wurm testified that, had he been aware of Joanna Siers's presence during the trial and of her testimony as presented on habeas review, he would have had no strategic reason not to call her as a witness.

## II.

The sole issue before us is whether the district court properly concluded that the South Dakota Supreme Court's holding that Wurm's failure to interview Joanna Siers did not amount to ineffective assistance of counsel was an unreasonable application of federal law. Because we conclude that the district court failed to give appropriate deference to the state court's finding that Siers had suffered no prejudice as a result of Wurm's dereliction of duty, we reverse.

-4-

## A. Standards

We review the district court's legal conclusions de novo and its findings of fact for clear error. Hadley v. Groose, 97 F.3d 1131, 1134 (8th Cir. 1996).

A state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court only through a showing that the state court's decision was either (1) contrary to, or (2) an unreasonable application of, clearly established federal law as determined by the Supreme Court. Williams v. Taylor, 529 U.S. 362, 404-05 (2000); Newman v. Hopkins, 247 F.3d 848, 851 (8th Cir. 2001). In Williams, the Supreme Court articulated the deference due state court decisions on the merits in federal habeas proceedings concerning state prisoners under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which amended 28 U.S.C. § 2254(d)(1). Id. at 529 U.S. 402-03.

The opinion of the Court in Williams is a divided one, and the issue raised by the state in the present case is precisely the one that split the Court. The amended statute places considerable constraints on the authority of the federal courts to set aside state rulings:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any clam that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

§ 2254(d)(1).

Justice Stevens, who authored the bulk of the Court's opinion in <u>Williams</u>, read AEDPA's "contrary to . . . or an unreasonable application of . . ." language as comprising a single, relatively broad grant of authority, and thus parted company with the majority of the Court with respect to the proper scope of federal review in a small subset of cases:

> Our difference is as to the cases in which, at first-blush, a state-court judgment seems entirely reasonable, but a thorough analysis by a federal court produces a firm conviction that that judgment is infected by constitutional error. In our view, such an erroneous judgment is "unreasonable" within the meaning of [AEDPA] even though that conclusion was not immediately apparent.

529 U.S. at 390 (Stevens, J., concurring in the judgment).

Rejecting Justice Stevens's argument that the "contrary to" and "unreasonable application of" clauses ought to be read as a single grant of authority, the majority concluded that the statute limits the grant of habeas relief on claims adjudicated in state court to two narrow circumstances. <u>Id.</u> at 404-05.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u> at 413.

Justice O'Connor, writing for the majority, squarely rejected the proposition that AEDPA left room for federal courts to exercise their "independent judgment."

> Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 411. "Stated simply, a federal court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 410. Williams repeatedly emphasizes that a state court's determination that is simply erroneous does not meet the AEDPA standard for unreasonableness. Id. The source of "clearly established federal law" is limited to the jurisprudence of the Supreme Court, id. at 412.

## B. Ineffective Assistance of Counsel

The district court concluded that the South Dakota Supreme Court's decision was both contrary to and an unreasonable application of clearly established federal law governing ineffective assistance of counsel claims. The state contends that, in reaching this conclusion, the court conducted the sort of "independent judgment" inquiry advocated by Justice Stevens, rather than applying the "objectively unreasonable" standard mandated by the opinion of the Court in Williams.

Although the district court acknowledged the standards that Justice O'Connor set out in Williams, the state is correct in its contention that the court inappropriately adopted Justice Stevens's reasonableness standard. District Court Order at 7 ("The standard according to Williams is '[i]f, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's

custody . . . violates the Constitution, that independent judgment should prevail.'") (quoting Williams, 529 U.S. at 389 (Stevens, J., concurring in judgment)).   The question before us, then, is whether the grant of habeas relief was appropriate under the more deferential "objectively unreasonable" standard, given the South Dakota Supreme Court's adjudication of Siers's ineffective assistance claim on the merits.

To show that his counsel was ineffective, Siers must show both that his attorney's performance was deficient and that he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 687 (1984); Hadley, 97 F.3d at 1135.  We need not inquire into the effectiveness of counsel, however, if we determine that no prejudice resulted from counsel's alleged deficiencies.  Strickland, 466 U.S. at 697; Blankenship v. United States, 159 F.3d 336, 338 (8th Cir. 1998).  In order to show prejudice, a habeas petitioner must establish "that there is a reasonable probability that but for counsel's unprofessional errors, the result . . . would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694; Williams, 529 U.S. at 394; United States v. Scott, 218 F.3d 835, 838 (8th Cir. 2000), cert. denied sub nom., 121 S. Ct. 500 (2000). In evaluating the probability of a different result, the court must consider the totality of the evidence.  Strickland, 466 U.S. at 695.

Although we are inclined to agree with the district court that the failure of Siers's counsel to interview Joanna Siers and Bordeaux was deficient, we reverse because we conclude that the South Dakota Supreme Court's determination that there was no resultant prejudice was not objectively unreasonable.

The district court accepted the South Dakota Supreme Court's factual determinations, but concluded that, although the state court had articulated the correct prejudice framework, its application of that framework was unreasonable because it failed to consider the interplay of the uncalled witnesses with those who were called. After determining that Wurm's performance was deficient, the district court made an

independent analysis of the credibility of each of the witnesses who were called, as well as that of Joanna Siers and Bordeaux. The court concluded that, particularly in light of the fact that Wurm called no defense witnesses whatsoever, the additional testimony probably would have changed the outcome and that Wurm's failure to investigate was therefore so prejudicial as to make a "no prejudice" finding unreasonable.

Having reviewed the South Dakota Supreme Court's prejudice analysis, we conclude that it is not an unreasonable application of clearly established federal law within the meaning of § 2254(d)(1). After reciting the Strickland standard, the South Dakota Supreme Court set forth the framework for its prejudice analysis:

> Standing alone, the fact that defense counsel failed to investigate a witness does not by itself satisfy the prejudice prong of Strickland. Hadley, 97 F.3d at 1135. "To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony 'would have probably changed the outcome of the trial.'" Id. (quoting Stewart v. Nix, 31 F.3d 741, 744 (8th Cir. 1994) (emphasis added)). In conducting this analysis, we will consider: "(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution." McCauley-Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996).

Siers v. Class, 581 N.W.2d at 497-98.

The South Dakota Supreme Court based its prejudice determination on its assessments that (1) the jury would not have considered Joanna Siers a credible witness because she was Siers's sister and because she had not told anyone prior to the trial that Siers was with her the night of the rape, despite numerous opportunities to do so; (2) Bordeaux would not have made a credible witness because of his relationship with

Siers's sister; (3) the physical evidence that S.B. had been the victim of a forcible rape was overwhelming; (4) S.B. was highly credible on the issue of identity because she had spent considerable time with her attacker and because, although she was from out of state and had never met Siers, she knew the Silver Street address, a fact that could only have come from her attacker; and (5) Larvie , who knew Siers and who was the only witness who was not subect to impeachment on the basis of bias, placed S.B. and Siers together at the store immediately after the rape. Id. at 498. In light of these considerations, the court concluded that Siers had failed to demonstrate a reasonable probability that the additional testimony would have changed the outcome. Id.

Even if we assume that the district court correctly concluded that the South Dakota Supreme Court's weighing of the factors was erroneous, it still had no basis under § 2254(d)(1) to grant habeas relief because such an error does not rise to the level of objective unreasonableness. See Williams, 529 U.S. at 410-12. The fact that evidence exists which led the district court to a contrary conclusion does not mean that the South Dakota Supreme Court failed to consider the totality of the evidence as required by Strickland. See Phoenix v. Matesanz, 233 F.3d 77, 83-84 (1st Cir. 2000) (federal court's disagreement with a state court's holding on a close issue does not make the state court's decision unreasonable). Unlike the Virginia Supreme Court in Williams, the South Dakota Supreme Court did not ignore evidence favorable to the defendant in evaluating the probability of a different outcome, see id. at 397-98, but simply differed from the district court in its opinion of its probable effect on the outcome. Its conclusion that there was no prejudice is therefore sufficiently reasonable to be entitled to deference under AEDPA. Accordingly, the district court erred in granting the habeas petition.

The judgment is reversed, and the case is remanded to the district court with direction to dismiss the petition.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.