# United States Court of Appeals
## For the First Circuit

No. 03-1423

RUSSELL J. HORTON,

Petitioner, Appellant,

v.

PETER ALLEN, ET AL.,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,* Senior U.S. District Judge]

Before

Selya and Howard, Circuit Judges,

and Singal,** District Judge.

Emanuel Howard for appellant.
Annette C. Benedetto, Assistant Attorney General with whom
Thomas F. Reilly, Attorney General, was on brief, for appellees.

May 26, 2004

---

*Of the Southern District of New York, sitting by designation.

**Of the District of Maine, sitting by designation.

**HOWARD**, **Circuit Judge**.   Petitioner Russell Horton, a Massachusetts state prisoner convicted of two first-degree murders, appeals from the denial of his petition for a writ of habeas corpus.  We affirm.

## I. Factual Background

In June 1998, a jury convicted Horton of committing two first-degree murders and an assault with the intent to murder.  We provide a summary of the evidence introduced at Horton's trial.  See Commonwealth v. Horton, 753 N.E.2d 119, 122-24 (Mass. 2001).

On May 25, 1994, the three victims, Carlos and Manuel Araujo and Kepler Desir drove together from Boston to Brockton, Massachusetts.  During the drive, Desir instructed Manuel to pick up Horton and Frederick Christian on Owens Street in Brockton.  Desir knew these two men, but the Araujos did not.  Christian and Horton got into the back seat of the car with Carlos, and the five men drove off together.

During the drive, Horton announced that he wanted to rob some "Dominican drug dealers" and instructed Manuel to drive to a certain location where he could carry out his plan.  Along the way, Horton exposed a gun and asked the others if they had weapons.  They claimed that they did not.  Upon arriving at the site, Horton and Christian left the car but returned shortly, claiming that they were unable to complete the robbery.  After reentering the car, Horton instructed Manuel to drive to a nearby parking lot.

In the parking lot, while staring out the window, Carlos was shot in the head.  He immediately slumped forward, pretending to be dead.  After two more shots were fired, Carlos heard Horton say, "Go through their pockets."  Carlos then sensed Christian move from his seat and heard him ask Horton, "Did you do him?"  Several minutes later, Christian and Horton departed the scene.

After laying still for a few more moments, Carlos saw the bodies of Manuel and Desir and ran to the nearest house for help.  Carlos told the people in the house that "Russell" had shot him.  Later, at the hospital, Carlos repeated that "Russell" had shot him.

Barry Stephens lived near the parking lot where the murders occurred and knew Horton and Christian.  He testified that Horton had sold drugs for Desir but, because of a recent falling out, Horton was no longer working for Desir.  He also testified that, on the night of the murders, he had heard gun shots, and that five minutes later, Horton and Christian had arrived at his house.  According to Stephens, Horton "was foaming at the mouth" and looking "wild."  Horton told him that, "[He] smoked him . . . [He] smoked all three of them."  In particular, Horton said that he had "smoked Quarter," which was Desir's nickname.  Stephens told Horton and Christian to leave immediately.

At the time of the murders, Christian was in financial trouble.  On the day of the shootings, Christian stated that he

needed money and asked Desir for drugs on credit, a request which Desir refused. Horton and Christian believed that Desir was carrying a large amount of cash on the night of the murders because he was planning to travel to New York later that night to buy several thousand dollars worth of drugs.

Horton gave inconsistent statements concerning his whereabouts on the night of the murders. He first told the police that he had met up with Christian, that they had gone for a walk with another friend, and had gone home at approximately 11 p.m. After the police indicated that they intended to search the car for fingerprints and talk to Christian, Horton changed his story. He stated that he and Christian were with Desir and two other men, and that they had driven to Fuller Avenue, where he and Christian left to buy drugs. He told the police that he expected Desir to return to pick him up, but Desir never did.

## II. Procedural Background

The trial court sentenced Horton to concurrent life terms of imprisonment for the murders and a 10-15 year term for the assault. Horton subsequently filed a motion for new trial, see Mass. R. Crim. P. 30, which was denied by the trial court. Thereafter, the Supreme Judicial Court of Massachusetts (SJC) rejected Horton's direct appeal and his appeal from the denial of his new trial motion. See Horton, 753 N.E.2d at 131.

-4-

Horton then filed a timely petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts. See 28 U.S.C. § 2254(d). In his petition, Horton claimed that (1) his right to a public trial was violated; (2) his right to confront witnesses was violated; (3) the jury instructions were incorrect; and (4) his trial counsel was ineffective. In an unpublished memorandum and order, the district court rejected the petition. See Horton v. Maloney, No. 02-CV-10416-MEL, (D. Mass. Feb. 5, 2003). Horton obtained certificates of appealability for each of the claims, except the jury instruction issue. See 28 U.S.C. § 2253.

### III. Discussion

Horton's appeal raises three claims. First, he argues that the trial court violated his Sixth Amendment right to a public trial by holding the individual voir dire of potential jurors in an anteroom rather than the courtroom. Second, he contends that the trial court violated his Sixth Amendment right to confront witnesses by admitting certain hearsay testimony. Third, he asserts that his Sixth Amendment right to effective counsel was violated because defense counsel did not call certain alibi witnesses and failed to interview certain potential character witnesses.

Horton's habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). See 28

-5-

U.S.C. §§ 2244-2266. Under the AEDPA, a federal court may grant a habeas petition if it finds that the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Under the "contrary to" prong of 28 U.S.C. § 2254(d)(1), the petition may be granted if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1), the petition may be granted if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. To be an unreasonable application of governing law, the state court's determination must not only be incorrect but also be objectively unreasonable. Id. at 410-11. In other words, if the petition presents a close call, it must be rejected, even if the state court was wrong. See Nom v. Spencer, 337 F.3d 112, 116 (1st Cir. 2003). If, however, the petition presents a federal claim that was raised before the state court but was left unresolved, the AEDPA's strict standards do not apply. See Fortini v. Murphy, 257 F.3d 39, 47

(1st Cir. 2001).  In such a circumstance, we review the claim <u>de novo</u>.  <u>See</u> <u>Norton</u> v. <u>Spencer</u>, 351 F.3d 1, 5 (1st Cir. 2003).

### A.    Public Trial

Horton and the prosecution jointly requested that the trial court conduct an individual voir dire of prospective jurors to ask them about the effect that racial prejudice and pretrial publicity could have on their ability to decide the case impartially.[1]  Massachusetts law requires that an individual voir dire be conducted "outside the presence of other persons about to be called as jurors or already called."  Mass. Gen. L. ch. 234, § 28.  To comply with this statute, the court conducted the individual voir dire in an anteroom, while the other potential jurors waited in the courtroom.  Horton and his counsel were present for the entire proceeding, and Horton was able to aid his counsel throughout.[2]  Defense counsel did not object to conducting the individual voir dire in the anteroom.  Accordingly, the SJC held that the issue was not preserved for appellate review and considered it only for "a substantial likelihood of a miscarriage of justice."  <u>Horton</u>, 753 N.E.2d at 127.  The SJC rejected the claim because Horton did not suffer prejudice from the voir dire procedure.  <u>Id.</u> at 128.

---

[1] Horton is African American.

[2] The judge, prosecutor, clerk, court reporter, and court officer were also present.

-7-

Citing <u>Press-Enterprise Co.</u> v. <u>Superior Court</u>, 464 U.S. 501 (1984), Horton argued in the district court that this voir dire procedure violated his right to a public trial because the public was excluded from attending the individual juror questioning. The district court rejected this claim on procedural default grounds because defense counsel did not object at trial.

Generally, habeas review is precluded when a state court reaches its decision on an independent and adequate state law ground. <u>See</u> <u>Coleman</u> v. <u>Thompson</u>, 501 U.S. 722, 729 (1991). A state court's decision to find a forfeiture, based on the defendant's failure to object at trial, is an independent and adequate ground for decision so long as the state court consistently applies its contemporaneous objection rule and has not waived it in the particular case by basing the decision on some other ground. <u>See</u> <u>Burks</u> v. <u>Dubois</u>, 55 F.3d 712, 716 (1st Cir. 1995). That is the situation here. The SJC consistently enforces the rule that unpreserved claims are forfeited, <u>see</u> <u>Gunter</u> v. <u>Maloney</u>, 291 F.3d 74, 79 (1st Cir. 2002), and enforced the rule in the instant case, <u>see</u> <u>Horton</u>, 753 N.E.2d at 127. The SJC did review the claim for a "substantial miscarriage of justice," <u>id.</u>, but this sort of limited review does not work a waiver of the contemporaneous objection requirement. <u>See</u> <u>Gunter</u>, 291 F.3d at 79-80; <u>Dubois</u>, 55 F.3d at 716 n.2; <u>Tart</u> v. <u>Massachusetts</u>, 949 F.2d

490, 496 (1st Cir. 1991); Puleio v. Vose, 830 F.2d 1197, 1200 (1st Cir. 1987).

Because the SJC resolved Horton's claim on state law grounds, the habeas court may consider the claim if Horton establishes "cause and prejudice" with respect to the procedural default.[3]  See Dretke v. Haley, -- U.S. --, 124 S.Ct. 1847, 1851-52 (2004); Coleman, 501 U.S. at 750.  To satisfy the cause portion of the test, Horton must show "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986). One way to establish cause is to demonstrate that defense counsel's inaction constituted ineffective assistance of counsel.  See Coleman, 501 U.S. at 752; Carrier, 477 U.S. at 488;  Gunter, 291 F.3d at 81.  Horton takes this tack in an effort to establish cause.

Under Strickland v. Washington, 466 U.S. 668, 688 (1984), counsel's performance is ineffective only if it was objectively unreasonable under prevailing professional norms.[4]  To prevail on

---

[3] A procedural default may also be excused if the defendant shows a fundamental miscarriage of justice, i.e., "a constitutional violation that has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995) (internal quotations and citations omitted). Horton has made no such showing here.

[4] Strickland also requires a demonstration of prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.  Citing Waller v. Georgia, 467 U.S. 39, 49-50 &

his claim, Horton must overcome the "strong presumption that . . . the challenged action might be considered sound trial strategy." Tejeda v. Dubois, 142 F.3d 18, 22 (1st Cir. 1998) (quoting Strickland, 466 U.S. at 689). Horton contends that his counsel was ineffective by failing to object to the voir dire procedure because the "public trial right of a criminal defendant was clearly established by the time of trial." The trial court rejected this claim, finding that Horton's counsel welcomed the individual voir dire procedure because "it was most conducive to eliciting candid responses by the jurors on possible prejudice." The SJC agreed, noting that "the less public setting for the voir dire in all likelihood helped rather than harmed [Horton]." Horton, 753 N.E.2d at 128.[5]

_____

n.9 (1984), Horton argues that the prejudice prong of Strickland is automatically satisfied because the denial of a public trial is a structural error. Because, as discussed in the text, we resolve the ineffective assistance claim on the performance prong of the analysis, we do not decide if prejudice would be presumed in the present circumstances.

[5] Horton has not introduced competent evidence to challenge the state court's finding that defense counsel welcomed the voir procedure for strategic reasons. See 28 U.S.C. § 2254(e)(1) (stating that in habeas proceeding state court factual determinations are presumptively correct absent contrary showing by clear and convincing evidence). The only arguably contrary information is an affidavit from Horton's habeas counsel containing a summary of his conversations with defense counsel in which defense counsel stated that he should have insisted that the individual voir dire be conducted in public. This affidavit is inadequate to justify disregarding the state court's finding. Cf. United States v. Maguire, 600 F.2d 330, 332 (1st Cir. 1979) (holding that affidavit of appellate counsel summarizing conversations with trial counsel in which trial counsel admitted

-10-

In some circumstances, defense counsel's interest in protecting the accused's right to a completely public trial may give way to other concerns, such as maximizing the accused's chance of obtaining a favorable jury composition. For this reason, the defendant may have an "interest in protecting juror privacy in order to encourage honest answers to the voir dire questions." Press-Enterprise, 464 U.S. at 515 (Blackmun, J., concurring). In particular, defense counsel may wish to shield jurors from public questioning when the objective is to identify possible racial biases in the venire because the prospects of a potential juror publically admitting such bias are slim. As one court noted, "It is no doubt a difficult thing for any person to admit to any degree of racial bias, but to do so [publically] might well require what the theologians used to call heroic virtue." United States v. King, 911 F. Supp. 113, 117 (S.D.N.Y. 1995), aff'd 140 F.3d 76 (2d Cir. 1998); see also In re S. Carolina Press Ass'n, 946 F.2d 1037, 1043 (4th Cir. 1991) ("[F]ear of publicity that might be given to answers of venirepersons during voir dire may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the Fourteenth Amendment"); United States v. Colabella, 448 F.2d 1299, 1304 (2d Cir. 1971) ("It is too much to expect of human nature that a juror would volunteer in open

---

making errors is hearsay and cannot establish ineffective assistance claim).

-11-

court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial. Not only so, but had one or more of them said they would be so influenced, and especially if they had then explained why, the damage to the defendant would have been spread to the listening other jurors.") (internal quotations and citations omitted); United States v. Koubriti, 252 F. Supp. 2d 424, 431 (E.D. Mich. 2003) ("The potential jurors will be more candid in their responses if they do not have to worry about what the public's opinion of those responses might be.") (internal quotations and citations omitted); Kimba M. Wood, Reexamining the Access Doctrine, 69 S. Cal. L. Rev. 1105, 1119 (1996) ("When jurors are reticent, the parties are denied the opportunity to probe meaningfully for bias. The more intimate setting of the robing room is far more conducive for probing bias.").

While Horton may have had a right to insist that the entire voir dire be conducted publically, see State v. Torres, 844 A.2d 155, 158 (R.I. 2004), the strategic advantage that he received from the individual voir dire taking place in private cannot be ignored.[6] Defense counsel's decision to agree to a closed

---

[6] Arguably, Horton's public trial rights were not violated because he has not demonstrated that the trial court actually excluded any members of the public from attending the juror questioning. See Commonwealth v. Harris, 703 A.2d 441, 446 (Pa. 1998) (rejecting public trial claim based on voir dire conducted in anteroom because "no exclusionary order was entered and the record does not establish that the court prohibited the public from

-12-

individual voir dire was an objectively reasonable strategy designed to elicit forthcoming responses from the jurors about racial bias. Accordingly, we cannot conclude that defense counsel was ineffective in failing to object to the voir dire procedure. Because Horton has failed to demonstrate ineffective assistance of counsel, he has not established cause for the procedural default. The district court therefore correctly declined to reach the merits of the public trial claim. See Dubois, 55 F.3d at 718.

**B.    Confrontation Clause**

Over Horton's objection, the trial court admitted testimony from one Henry Garcia that, on the day of the murders, Christian had stated that he needed money and that Desir had refused to give him drugs on credit. The SJC affirmed the admission of this testimony under the state-of-mind exception to the hearsay rule. See Horton, 753 N.E.2d at 125. The SJC's analysis was based exclusively on Massachusetts evidence law and did not reference Horton's Confrontation Clause claim. Id. Because the SJC did not resolve the constitutional issue, we consider it de novo. See Fortini, 257 F.3d at 47.

---

observing the individualized voir dire"). Moreover, there is no evidence that the trial court limited the availability of a transcript of the individual voir dire proceeding. As the Press-Enterprise Court recognized, in at least some circumstances, "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceeding available within a reasonable time." 464 U.S. at 512.

After this appeal was briefed, the Supreme Court decided Crawford v. Washington, -- U.S. --, 124 S.Ct. 1354 (2004), which changed the legal landscape for determining whether the admission of certain hearsay statements violates the accused's right to confront witnesses.   In Crawford, the Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the accused has had a prior opportunity to cross-examine the declarant.  Id. at 1374.   This holding abrogated, in part, the prior rule that the admission of hearsay did not violate the Confrontation Clause if the declarant was unavailable and the statement fell under a "firmly rooted hearsay exception" or otherwise bore particularized guarantees of trustworthiness.  Ohio v. Roberts, 448 U.S. 56, 66 (1980).

At oral argument, the parties disagreed over Crawford's application to Horton's petition.  The debate is important because "new rules of criminal procedure" do not apply in habeas proceedings unless they fall within either of two exceptions: (1) the rule places a class of private conduct beyond the power of the state to proscribe, or (2) the rule is a "watershed rule" of criminal procedure, implicating the fundamental fairness and accuracy of the proceeding.  See Teague v. Lane, 489 U.S. 288, 310-11 (1989); Curtis v. Duval, 124 F.3d 1, 5 (1st Cir. 1997).   While the question of the retroactive effect of Crawford, if any, is an important one, we bypass the question here because, as explained

-14-

below, Crawford does not apply to this case. See Campiti v. Matesanz, 333 F.3d 317, 321-22 (1st Cir. 2003) (stating that court need not resolve a Teague issue that was susceptible of resolution on narrower or easier grounds).

Crawford draws a distinction between testimonial and nontestimonial hearsay and applies only to the former category of statements. See 124 S.Ct. at 1374. As the Court explained, "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law--as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Id. Thus, unless Christian's statements qualify as "testimonial," Crawford is inapplicable and Roberts continues to apply.

The Crawford Court declined to provide a comprehensive definition of testimonial statements. Id. at 1374 & n.10. It did, however, provide three "formulations of [the] core class of testimonial statements." Id. at 1364. In the first, testimonial statements consist of "ex parte in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Id. The second formulation described testimonial statements as

-15-

consisting of "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." Id. (quoting White v. Illinois, 502 U.S. 346, 365 (1992)). Finally, the third explained that testimonial statements are those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. While the Court declined to settle on a single formulation, it noted that, "[w]hatever else the term [testimonial] covers, it applies . . . to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to police interrogations. These are the modern abuses at which the Confrontation Clause was directed." Id. at 1374.

In light of these formulations, Christian's statements do not qualify as testimonial. They were not ex-parte in-court testimony or its equivalent; were not contained in formalized documents such as affidavits, depositions, or prior testimony transcripts; and were not made as part of a confession resulting from custodial examination. Rather, Christian's statements were made during a private conversation with Garcia. In short, Christian did not make the statements under circumstances in which an objective person would "reasonably believe that the statement would be available for use at a later trial." Id. at 1364. Because Christian's statements were nontestimonial, their admission

is outside of <u>Crawford</u>'s scope.  <u>See</u> <u>id.</u> ("an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"); <u>United States</u> v. <u>Reyes</u>, 362 F.3d 536, 540 n.4 (8th Cir. 2004) (stating that <u>Crawford</u> does not apply to co-conspirator statements because they are nontestimonial).  Accordingly, we apply <u>Roberts</u> to determine whether the admission of Christian's hearsay statements violated Horton's Confrontation Clause rights.

As discussed above, <u>Roberts</u> permits the admission of a hearsay statement of an unavailable declarant as long as the statement "falls within a firmly rooted hearsay exception" or otherwise bears particularized guarantees of trustworthiness.  <u>See</u> <u>supra</u> at 13-14.  The relevant exception here is state-of-mind. Under Massachusetts law, the state-of-mind exception permits the admission of statements that demonstrate the declarant's intent to perform some future act.  <u>See</u> P.J. Liacos et al., <u>Handbook of Massachusetts Evidence</u>, § 8.15 (7th ed. 1999)(citing cases).  The SJC determined that Christian's statements that he needed money and that Desir would not give him drugs on credit suggested his intent to subsequently rob Desir, and the statements were admissible to show this intent.  <u>See</u> <u>Horton</u>, 753 N.E.2d at 125.[7]

---

[7] The statements were relevant because they provided an explanation for Christian's conduct on the night of the murders when he was acting with Horton.  Because the prosecution charged Horton with felony murder (based on the armed robbery of Desir), evidence suggesting that Horton's compatriot had a motive for

-17-

The admission of Christian's statements comports with Roberts. First, Christian was unavailable to testify because he was also accused of the murders. See Commonwealth v. Christian, 722 N.E.2d 416 (Mass. 2000). Second, the statements fall within a firmly rooted hearsay exception for statements evidencing the declarant's state-of-mind.

A hearsay exception is firmly rooted if, "in light of longstanding judicial and legislative experience [the exception] rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection." Lilly v. Virginia, 527 U.S. 116, 126 (1999) (internal quotations and citations omitted). The state-of-mind exception has been recognized by the Supreme Court and the SJC for over a century. See Mut. Life Ins. Co. v. Hillman, 145 U.S. 285, 295-96 (1892) (admitting letter stating that declarant intended to travel to a certain destination with another); Commonwealth v. Trefethen, 31 N.E. 961, 964-65 (Mass. 1892) (admitting statement of declarant's intention to commit suicide). Indeed, "the exception exists in every jurisdiction in the country, whether by statute, court rule, or common law tradition," Hayes v. York, 311 F.3d 321, 325 (4th Cir. 2002), and has been codified in the Federal Rules of Evidence, see Fed. R. Evid. 803(3). The

robbing Desir was relevant to proving the prosecution's theory of the case.

-18-

premise for admitting hearsay statements evidencing state-of-mind is that such statements are reliable because of their "spontaneity and [the] resulting probable sincerity." McCormick on Evidence, § 274 (5th ed. 1999). Thus, the rationale for the state-of-mind exception is similar to the rationale for the other hearsay exceptions that the Supreme Court has recognized as "firmly rooted." See Lilly, 527 U.S. at 127 (stating that firmly rooted exceptions are those that permit the admission of declarations "made without motive to reflect on the legal consequences of one's statements and in situations that are exceptionally conducive to veracity"). Considering the state-of-mind exception's lineage and policy origins, we agree with the many other courts that have recognized it to be a firmly rooted hearsay exception. See, e.g., Hayes, 311 F.3d at 326; Moore v. Reynolds, 153 F.3d 1086, 1107 (10th Cir. 1998); Terrovona v. Kincheloe, 852 F.2d 424, 427 (9th Cir. 1988); Barber v. Scully, 731 F.2d 1073, 1075 (2d Cir. 1984); Lenza v. Wyrick, 665 F.2d 804, 811 (8th Cir. 1981); Frazier v. Mitchell, 188 F. Supp. 2d 798, 813-14 (N.D. Ohio 2001); United States v. Alfonso, 66 F. Supp. 2d 261, 267 (D.P.R. 1999); Reyes v. State, 819 A.2d 305, 313 (Del. 2003); People v. Waidla, 996 P.2d 46, 67 n.8 (Cal. 2000); Wyatt v. State, 981 P.2d 109, 115 (Alaska 1999); State v. Wood, 881 P.2d 1158, 1169 (Ariz. 1994).

To sum up, because Christian's hearsay statements were nontestimonial, we apply Roberts to decide the Confrontation Clause

issue.  The admission of these statements satisfies <u>Roberts</u> because Christian was unavailable to testify, and the statements were admitted pursuant to a firmly rooted hearsay exception. Accordingly, Horton's Confrontation Clause rights were not violated.

**C.      Ineffective Assistance of Counsel**

Finally, Horton claims that the SJC misapplied federal law in rejecting his ineffective assistance of counsel arguments based on defense counsel's failure to call his family members as alibi witnesses and to interview his school teachers as possible character witnesses.  In assessing these arguments, the SJC applied its rule that "on a claim of ineffective assistance of counsel in a case of murder in the first degree, the defendant must show there was an error in the trial and that the error likely influenced the jury's decision."  <u>Horton</u>, 753 N.E.2d at 127 (citing <u>Commonwealth</u> v. <u>Wright</u>, 584 N.E.2d 621 (Mass. 1992)).  The <u>Wright</u> standard is at least as generous to the defendant as the federal ineffective assistance of counsel standard.  See <u>Mello</u> v. <u>DiPaulo</u>, 295 F.3d 137, 144-45 (1st Cir. 2002).  Because the SJC applied the appropriate legal standard to Horton's claims, he can only succeed by demonstrating that the SJC unreasonably applied this standard to the facts of his case.  See <u>supra</u> at 5-6.

The SJC rejected Horton's claims because it determined that defense counsel had valid reasons for declining to call

-20-

Horton's family members and that Horton was not prejudiced by defense counsel's failure to interview his teachers. See Horton, 753 N.E.2d at 128-29. Horton argued that his family members would have established his alibi by testifying that he was home at 10 p.m., the time that the murders occurred. The SJC concluded, however, that had these witnesses been called they would have been open to damaging impeachment. Id. at 128. Therefore, it was a reasonable decision not to call them. Id. The SJC also determined that interviewing Horton's teachers would not have benefitted the defense because there would have been testimony of an unflattering change in Horton's demeanor just prior to the murders. Id. at 128-29.

As discussed above, to succeed on his ineffective assistance of counsel claims, Horton must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. See supra at 9-10; Phoenix v. Matesanz, 233 F.3d 77, 81 (citing Strickland, 466 U.S. at 687). "The habeas court must evaluate the challenged conduct from counsel's perspective at the time . . . making every effort to eliminate the distorting effects of hindsight." Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993) (internal citations and quotations omitted). It must also start with the presumption that the challenged action was sound trial strategy. Phoenix, 233 F.3d at 82.

The SJC reasonably determined that defense counsel made a sound decision in declining to call Horton's family members as alibi witnesses. As we have explained,

> The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony. The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perception of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused.

Lema, 987 F.2d at 54 (internal citations omitted).

Defense counsel interviewed the family members before deciding that their testimony would not have helped Horton's case. The proposed alibi testimony would have been open to impeachment because it was based primarily on vague assertions from Horton's father on the approximate time of a basketball game. More important, the proposed testimony would have conflicted with Horton's own version of events (that he came home at 11 p.m.), leaving the jury with the option of rejecting the alibi witnesses's testimony or rejecting Horton's own story. Considering the possible danger to the defense from calling these witnesses, the decision to bypass them reasonably could be viewed as legitimate trial strategy. See Phoenix, 233 F.3d at 82 n.2 (stating that trial strategy does not constitute ineffective assistance unless

-22-

counsel's decision was "so patently unreasonable that no competent attorney would have made it").

The SJC was also reasonable in rejecting Horton's claim concerning defense counsel's failure to interview his teachers. Despite being told by Horton's father that Horton's teachers could provide positive character testimony, defense counsel failed to speak with them. In some instances, the failure of defense counsel to interview witnesses can establish the deficient performance prong of the Strickland analysis. See, e.g., Riley v. Payne, 352 F.3d 1313, 1318 (9th Cir. 2003). But even assuming that defense counsel's performance was deficient in this respect, the error would not have prejudiced Horton's defense.

The affidavits summarizing the teachers' expected testimony are mixed. The teachers would have presented a generally favorable view of Horton as a courteous person and a good student. But they also would have also testified that Horton seemed distracted in the days leading to the murders. In particular, one teacher would have testified that, because of Horton's changed demeanor, she asked him if "anything was going on," and he responded that he "was just taking care of business." Testimony of a noticeable change in Horton's demeanor, just prior to the murders, likely would have damaged his case more than testimony about his general good character would have helped. Considering the limited positive impact (if any) that the character testimony

-23-

would have had, the SJC reasonably concluded that defense counsel's failure to interview these witnesses likely would not have influenced the trial outcome. See Siers v. Weber, 259 F.3d 969, 974-75 (8th Cir. 2001) (affirming denial of habeas petition based on ineffective assistance counsel due to counsel's failure to interview witnesses where defendant failed to establish prejudice); United States v. Mitchell, 216 F.3d 1126, 1131 (D.C. Cir. 2000) (similar); Clabourne v. Lewis, 64 F.3d 1373, 1382 (9th Cir. 1995) (similar); Galowski v. Murphy, 891 F.2d 629, 638 (7th Cir. 1989) (similar).

## IV. Conclusion

For the reasons set forth above, the judgment of the district court is **<u>affirmed</u>**.