Dwayne OWENS, Petitioner,

v.

UNITED STATES, Respondent.

Civ. Action. No. 01cv10061–NG.

United States District Court, D. Massachusetts.

Oct. 9, 2007.

---

Allison D. Burroughs, Nutter, McClennen & Fish, LLP, Theodore B. Heinrich, United States Attorney's Office, Boston, MA, for Respondent.

Peter B. Krupp, Lurie and Krupp, LLP, Boston, MA, for Petitioner.

***MEMORANDUM AND ORDER***

GERTNER, District Judge.

This case comes before this Court on remand from the First Circuit, addressing Dwayne Owens' ("Owens") petition for habeas corpus pursuant to 28 U.S.C. § 2255. The only remaining claim is Owens' argument that his Sixth Amendment right to a public trial was violated by the trial court's effective closure of the courtroom during

voir dire. For the reasons given herein, the motion is **GRANTED**.

## I.  BACKGROUND

### A.  Procedural History

On March 27, 1997, following a trial in federal district court for the District of Massachusetts, a jury found Dwayne Owens guilty of murder, conspiracy to commit murder, racketeering, interstate travel in aid of racketeering, conspiracy to possess and distribute cocaine, the use of a firearm in the commission of a violent crime, possession of a firearm while a fugitive of justice, and money laundering. Two months later, Owens was sentenced to life imprisonment. Owens' convictions and sentence were affirmed by the First Circuit, *United States v. Owens (Owens I)*, 167 F.3d 739 (1st Cir.1999),[1] and the Supreme Court denied certiorari, 528 U.S. 894, 120 S.Ct. 224, 145 L.Ed.2d 188 (1999).

Owens then filed a timely motion to overturn, vacate, or modify his sentence. *See* 28 U.S.C. § 2255. In doing so, he asserted eleven distinct arguments based on claimed violations of his Fourth, Fifth, and Sixth Amendment rights. The original trial judge, *Owens v. United States (Owens II)*, 236 F.Supp.2d 122 (D.Mass. 2002), and this Court, Memorandum and Order of November 30, 2004 (document # 59), addressing separate grounds, denied his petition. The First Circuit reversed in part, affirmed in part, and remanded. *Owens v. United States (Owens III)*, 483 F.3d 48 (1st Cir.2007). Specifically, the First Circuit reversed the district court's decision on two of the eleven grounds.[2] First, it found it an abuse of discretion not

to grant an evidentiary hearing on Owens' Sixth Amendment claim that his counsel had failed to inform him of his right to testify. *Id.* at 60–61. Second, it similarly found an abuse of discretion in the decision not to grant an evidentiary hearing on Owens' Sixth Amendment contention that the closure of the courtroom during voir dire violated his right to a public trial. *Id.* at 66. The denial of other grounds for relief was affirmed.

Owens later waived the first of those grounds before this Court. Pet.'s Pre-hearing Br. (document # 94) at 2. Thus, the only remaining ground for the petition is the public trial claim. That claim was procedurally defaulted, Owens having failed to object at the time of the closure or to raise the issue on direct appeal. *See Owens III*, 483 F.3d at 61. Therefore, to make out his claim, Owens must show not only that his Sixth Amendment rights were in fact violated, he must also demonstrate "cause" for his failure to raise the claim earlier, and that he was "prejudiced" by the violation. *E.g., Coleman v. Thompson*, 501 U.S. 722, 746–47, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Owens argues cause is given by the ineffectiveness of his trial and appellate counsel, since they failed to raise the issue. Prejudice, in this case, does not stem from a particularized showing that, absent error, there would have been a reasonable probability of a different trial outcome. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Rather, it comes from the cascading effects that an unfair jury selection may have on the re-

1.  That opinion also contains a more extensive description of the underlying crimes. *See Owens I*, 167 F.3d at 743.

2.  The original trial judge ruled on the reversed issues. He also recused himself in part; the issues on which he did so were

subsequently assigned to this Court. Furthermore, the First Circuit also ordered (document # 85) that the case be assigned to a new trier of fact on remand, and the matter was assigned to this Court as well.

mainder of the trial. *See Owens III*, 483 F.3d at 64–65.

### B. *The Closure of the Courtroom*

This Court held the evidentiary hearing ordered by the First Circuit on August 31, 2007. The petitioner called several witnesses. The Court finds credible the testimony of each, although noting that ten years on, details are understandably fuzzy.

William Owens, the petitioner's uncle, testified that he attended the first day of the trial, but that when he attempted to enter the courtroom, "there were two court officers at the door, and they did not permit me to go in." Tr. of the August 31, 2007, Evidentiary Hrg. ("Hrg.Tr.") at 54. He further testified that he identified himself as a relative, but was still denied access. *Id.* at 55. He saw people—perhaps dismissed jurors—leaving the courtroom, *id.* at 56, but was still not permitted into the courtroom, *id.; see also id.* at 71 (stating that court security personnel told him that he could enter the courtroom "when the Judge says so"). Indeed, according to William Owens, the door to the courtroom's antechamber was locked, and he had to knock on it to get the attention of security personnel.

Similarly, Evelyn Bynoe, the petitioner's mother, stated that she met William Owens at the courthouse every day of the trial, including the first day. She also testified that she was denied access at the door of the courtroom. *Id.* at 83. She testified that court security told her that the "Judge did not want anyone in the courtroom." *Id.* at 91.[3]

The government also called Elizabeth ("Bonnie") Smith, the courtroom deputy clerk present the day of the voir dire. Smith testified that she was certain there were spectators in the courtroom the day of the voir dire, but she could not recall what they looked like. *Id.* at 12–13. She indicated that she had announced that spectators could come in as seats became available, although this comment was apparently off the record. Although Smith stated that she thought William Owens and Bynoe were present in the courtroom and left when voir dire began, she understandably admitted she could not recall precisely whether they had been there. *Id.* at 17, 35. Furthermore, she could not recall when, or even whether, seats began to become available for the public. *See id.* at 42–43.

The transcript of the proceeding indicates that the following colloquy took place between the trial court and the marshal on the morning of the voir dire:

THE COURT: We're going to get 72 jurors here. That will mean we'll have a number of jurors. Now, let me ask the marshals. It look[s] like we're going to need all the row[s] except for this first row. Is that going to be sufficient for you?

THE MARSHAL: I think so, your Honor. I just spoke to Bonnie [Smith] about it and ... [I will] have whatever spectators leave until there's a sufficient amount of room.

THE COURT: We'll need every seat with 72 people.

---

**3.** At the evidentiary hearing, the government questioned whether it was important to the witnesses to see the voir dire. They insisted that it was. *See, e.g.,* Hrg. Tr. at 93. Even if they had not, however, the government's argument would be inadequate. First, the rights at stake are those of the petitioner, not of his family. Second, regardless of whether it was important to the witnesses, it was important structurally that they be permitted to attend because of their potential effect on the venire persons. *See Owens III*, 483 F.3d at 61.

Tr. of *United States v. Dwayne Owens,* Feb. 10, 1997 ("Trial Tr.") at 4–5. At some point later, Judge Young found the panel indifferent. *Id.* at 79. Still later, the parties finished exercising their peremptory challenges. *See id.* at 109.

The accounts of all of the witnesses are thus consistent with one another,[4] as well as with the transcript of the trial. Whatever the trial court's intent or the instructions of his clerk, at no point in the interim were spectators notified that they could return to the courtroom. (Indeed, the Court credits William Owens' account that the court security officers blocked their entry.) The trial court then took a recess for lunch. *Id.* at 115. There is no later indication in the transcript that the courtroom remained cleared, or—conversely— that the spectators were notified they could return.

## II. *FINDINGS ON THE MERITS OF THE PETITION*

### A. *The Violation Vel Non*

█ In its opinion, the First Circuit ordered this Court to "determine the nature and extent of the trial closure," leading to a conclusion regarding whether "the trial was actually closed." *Owens III,* 483 F.3d at 66. Although memories have understandably faded in the intervening ten years, the trial transcript and the witnesses' testimonies coalesce around a single narrative. Judge Young ordered the courtroom cleared, as was standard practice, in order to make sufficient room for the entire venire so that he would only have to swear in the potential jurors and ask the panel questions a single time. William Owens and Evelyn Bynoe were thus asked to leave the courtroom. After jurors were excused, there was room avail-

able in the courtroom for them to return. However, out of a misunderstanding of Judge Young's order, court security personnel continued to bar William Owens and Bynoe from the courtroom for the rest of the day. They were not permitted to return to the trial until the following morning. Because the entire jury was selected that day, *see* Trial Tr. at 109, they were— albeit inadvertently—barred from the voir dire process.

Before the First Circuit, and before this Court, the government argued that this was a "trivial, inadvertent courtroom closure," *Bowden v. Keane,* 237 F.3d 125, 129 (2d Cir.2001), which did not affect Owens's substantial rights. That argument pertains both to whether the violation actually occurred and whether the defendant was prejudiced by it.

█ As to whether the closure was indeed trivial and inadvertent, this Court must follow the holding of the First Circuit. It noted, "[j]ury selection is ... a crucial part of any criminal case," *Owens III,* 483 F.3d at 63, and rejected the contention that the closure must be deliberate to violate the defendant's rights, *see id.* (citing *Walton v. Briley,* 361 F.3d 431, 433 (7th Cir.2004)) ("Whether the closure was intentional or inadvertent is constitutionally irrelevant."). The First Circuit's command was unmistakable: "[I]f the trial court barred spectators from the courtroom as Owens alleges, he was denied his Sixth Amendment right to have a public trial." *Id.*

This Court finds that Owens' allegations were accurate, and, consequently, that his Sixth Amendment right to a public trial

---

**4.** Neither Conrad, Hrg. Tr. at 107, 109, nor Sheketoff, *id.* at 145–47, could independently recall whether spectators were asked to leave the courtroom, or whether Bynoe and William Owens had been present at the start of the voir dire.

was violated.[5]

### B. *Cause*

■ Because his claim was procedurally defaulted, Owens also needs to demonstrate cause for his failure to raise an objection to the closure at trial. He argues that his silence on the matter was caused by his attorneys' ineffectiveness. To prevail, he must demonstrate that his "counsel's representation fell below an objective standard of reasonableness," *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, resulting in "prejudice[ ][to] his defense," *id.* at 688, 104 S.Ct. 2052.

As the trial court previously noted, the petitioner had "able and experienced attorneys" representing him at trial. *Owens II,* 236 F.Supp.2d at 144. However, even the best counsel may fall below objectively reasonable standards of effectiveness if they "fail to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission." *Prou v. United States,* 199 F.3d 37, 48 (1st Cir. 1999). Here, it seems clear that the failure to object was not tactical,[6] but based on lack of knowledge of the applicable law. Ms. Conrad admitted that, as of the time of the trial, she had never researched the

Sixth Amendment public trial issue. She stated, "I simply did not know that it was objectionable." *Id.* at 107–08; *see also id.* at 129. Ms. Conrad did, however, noted several other potentially appealable issues during the voir dire, stemming from the racial composition of the jury. 110–11.

Ms. Conrad also served as Mr. Owens' counsel on direct appeal. She testified that she was unaware of the possibility of raising the public trial claim on the Sixth Amendment issue. *Id.* at 111. Similarly, Mr. Sheketoff testified that he "didn't realize it was inappropriate to ... clear the courtroom of all spectators while the venire was going to come in." *Id.* at 145–46. Indeed, he thought "that [closing the courtroom] would be fine." *Id.* at 146; *see also id.* at 150–51.

There is some question as to whether the issue of voir dire closure was "important and obvious." While the Sixth Amendment right to a public trial is an important one, the objection may not have been "obvious" under the circumstances. If, for example, the order had been given to clear an *empty* courtroom, the failure to raise an objection might have been reasonable.[7] *See* Gov't's Post–Hrg. Br. (docu-

---

5. The Court notes that the presence of spectators for voir dire does not always redound in favor of the defendant. *Cf. Owens III,* 483 F.3d at 61 ("The guarantee of a public trial is for the benefit of the defendant...."). *See also Horton v. Allen,* 370 F.3d 75, 82–83 (1st Cir.2004) (stating some reasons why private voir dire might be beneficial for defendants). Some venire persons, asked to answer sensitive questions regarding their predilections and prejudices, may be uncomfortable telling the truth in front of a roomful of strangers. The First Circuit did not explicitly address the possibility of a defendant's waiving her Sixth Amendment right as to jury selection; nor, of course, does this Court have cause to address the issue.

6. *See also Owens III,* 483 F.3d at 64 ("[W]e do not see how the failure to object to the

closure could have been sound trial strategy.").

7. The Court disagrees with the petitioner's contention that "[t]he closure of the courtroom was evident from the trial transcript." Pet'r's PreHrg. Br. (document # 94) at 8. The closure did not necessarily become constitutionally significant at the point when spectators were asked to leave, *see* Trial Tr. at 5, but rather when they were not permitted to return after some jurors were excused. *Cf. Owens III,* 483 F.3d at 64 (noting that the courtroom was closed for the entire jury selection). It seems clear that several jurors were quickly dismissed for cause, *see* Trial Tr. at 19–22, which should have permitted spectators to re-enter.

ment # 99) at 17–18. Alternatively, it could have been perceived as futile if no spectators were present, and counsel are not required to raise futile objections. *See Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999).

However, the record evidence indicates this was not such a scenario. Ms. Smith testified to having seen spectators in the courtroom before it was cleared. Hrg. Tr. at 12–13. The marshal's statement to the trial court also indicates that there may have been spectators present. *See* Trial Tr. at 5 ("[I will] have whatever spectators leave until there's a sufficient amount of room.").

To be sure, the petitioner himself may have known of the exclusion in time to raise an objection at trial. *See* Hrg. Tr. at 77 (testimony of William Owens, stating, "Dwayne said where were you guys today? I said we were there.") There is no indication that Owens transmitted that knowledge to his attorneys, even after the fact. Standing alone, that might be sufficient to demonstrate that they were not ineffective in failing to raise the objection.[8] However, since his attorneys professed a belief that such conduct was within the bounds of the law, the Court can only conclude that the counsel would not have objected in any case.

Reasonable counsel with the requisite knowledge of the law would have objected—not just on learning that a particular person had been barred from the courtroom, but at the trial court's statement that the courtroom would be cleared. *See* Hrg. Tr. at 150–51 (testimony of Mr. Sheketoff, stating that he would now object in similar circumstances because his client "would have a right to a public trial, and

mere convenience would not be sufficient reason to infringe upon that right in any respect"). Here, it was the knowledge of the law that was lacking. In February 1997, courtroom closures were not an obscure, arcane body of law. To the contrary, the important Supreme Court precedents had existed for more than a decade. *See Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (finding a First Amendment right to public jury selection); *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (finding that criminal defendants have standing to object to courtroom closures). No First Circuit, District of Massachusetts, or Massachusetts state court cases had explicitly addressed the issue. However, shortly before this case went to trial, the Second Circuit decided a series of cases over courtroom closures during criminal trials. In *Ayala v. Speckard*, 89 F.3d 91 (2d Cir.1996), *modified on den. of reh'g*, 102 F.3d 649 (2d Cir. Dec.11, 1996), *vac'd on reh'g en banc*, 131 F.3d 62, 72 (2d Cir. Dec.3, 1997), that court ruled that *Waller* required not only that the trial court evaluate a proposed closure according to the standards the Supreme Court had set forth, but also to evaluate sua sponte the alternatives to closure. Failure to do so was error requiring a new trial. *See* 89 F.3d at 96–97. Subsequently, but before Owens' trial, the Second Circuit reversed two other district court decisions denying a writ of habeas corpus where a courtroom closure had violated the petitioner's right to a public trial. *See Pearson v. James*, 105 F.3d 828 (2d Cir. Jan.30, 1997); *Okonkwo v. Lacy*, 104 F.3d 21 (2d Cir.1997).

---

8. Nor, in such a scenario, would it be possible to assert that the nature of the exclusion was independent cause for the procedural default—unlike, for example, a case in which spectators had tried to enter the courtroom but were barred by court personnel, but neither the defendant nor counsel knew about the closure until after trial.

Owens' counsel should have been aware of these rulings.

Finally, the government maintains that it was not "per se unreasonable … [to] decid[e] that the minimal intrusion upon public access anticipated by the court's action did not warrant an objection." Gov't's Post–Hrg. Br. (document 99) at 22. For the reasons laid out at length in the First Circuit's opinion, *see Owens III*, 483 F.3d at 61–62, the intrusion was not "minimal." Nor were there costs weighing in favor of a tactical non-objection. The government cites *Horton v. Allen*, 370 F.3d 75, 82 (1st Cir.2004) as setting forth some considerations defense counsel could reasonably have made in not objecting. Those considerations do not pertain here. Individual voir dire, as in that case, occurs "'outside the presence of other persons about to be called as jurors or already called.'" *Id.* at 80 (quoting Mass. Gen. Laws ch. 234, § 28). Privacy provides for closer questioning of jurors, and, perhaps, more honest answers. *Id.* at 82. Here, the voir dire was conducted in front of the rest of the venire but without the presence of Owens' family. Without the advantages of individual voir dire to be lost, the objection to closing the courtroom was costless, save for the possibility that it would have irritated opposing counsel and the trial court.

█ The Court finds that Owens' counsel should have known the applicable law, and should have objected to the courtroom closure. Their failure to do so fell below an objective standard of reasonableness. *Cf. Prou*, 199 F.3d at 48. Therefore, their performance was constitutionally ineffective, and Owens has demonstrated cause for his failure to make a contemporaneous objection.

### C. *Prejudice*

█ Ordinarily, this Court would now address whether the habeas petitioner could demonstrate that he was prejudiced by the violation of his rights. However, the First Circuit determined that closure of the courtroom is a "structural error." *Owens III*, 483 F.3d at 64–65. It also concluded that since "it is impossible to determine whether a structural error is prejudicial … we must … conclude that a defendant who is seeking to excuse a procedurally defaulted claim of structural error need not establish actual prejudice." *Id.* at 64 (citation and footnote omitted). It reasoned that the spectators were necessary to remind the jury of its responsibility; presumably, too, the structural aspect of the error was exacerbated by the fact that the courtroom was closed for jury selection. *See, e.g., Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir.1998) (holding that it is structural error to permit the use of peremptory challenges to prevent persons of a certain race to serve on a jury). Thus, Owens need not show prejudice. *Owens III*, 483 F.3d at 66.

### D. *Conclusion*

Owens has demonstrated that the courtroom was, in fact, closed; he has also demonstrated that his counsel were ineffective by failing to raise that issue at trial or on appeal. In keeping with the First Circuit's decision, the petition is **GRANTED,** and his conviction **VACATED.** Owens is entitled to a new trial, free of structural error.

### III. *OWENS' RELEASE PENDING A NEW TRIAL*

The Court takes under advisement Owens' Motion for Order to Release on Conditions (document # 97) pending a hearing, to be scheduled as soon as possible by the Clerk.

### IV. *CONCLUSION*

For the foregoing reasons, the Motion to Vacate Under 28 U.S.C. 2255 (document

# 1) is **GRANTED.** Owens' convictions are **VACATED.** A hearing on his possible release will be scheduled at the earliest convenience of the Court and the parties.

**SO ORDERED.**