# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1940

_____

United States of America,　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　Plaintiff - Appellant,　　　*
　　　　　　　　　　　　　　　　　*　Appeal from the United States
　　v.　　　　　　　　　　　　　*　District Court for the
　　　　　　　　　　　　　　　　　*　Southern District of Iowa.
Monica Ann White,　　　　　　　　*
　　　　　　　　　　　　　　　　　*
　　　　Defendant - Appellee.　　　*

_____

Submitted: June 11, 2003

Filed: September 2, 2003

_____

Before BOWMAN, MURPHY, and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

The government appeals the district court's order granting Monica Ann White's 28 U.S.C. § 2255 petition. We reverse.

On January 14, 1998, White was indicted on charges of conspiracy to distribute cocaine base, possession with intent to distribute cocaine base, and distribution of cocaine base. The case was tried and a jury returned verdicts of guilty on all counts. The district court imposed a mandatory life sentence after determining White had two prior felony convictions and the charges involved more than fifty grams of cocaine base. White's convictions and sentence were affirmed on direct appeal. United

States v. White, No. 98-3975, 1999 WL 758648, at * 3 (8th Cir. Sept. 24, 1999). On June 22, 2000, White filed a § 2255 petition alleging, among other things, ineffective assistance of counsel. An evidentiary hearing was held, and on January 30, 2002, the district court granted White's petition finding she had received ineffective assistance of counsel. The district court vacated her convictions and ordered a new trial. This appeal followed.

I

The government alleged a conspiracy to distribute crack cocaine beginning on or about November 12, 1994, and continuing through January 14, 1998. The proof at trial focused primarily on three discrete events. The first occurred on November 12, 1994, while White was a passenger in a vehicle operated by Demitrius McWilliams which was stopped by police. McWilliams had no driver's license and was arrested. In the course of the traffic stop, White gave police a false name and was arrested because the person whose name she used was wanted on an outstanding warrant. Police searched the vehicle incident to arrest and discovered twenty-seven grams of crack cocaine under White's seat. White and McWilliams were taken to the police station and questioned. While at the police station, an officer overheard White on the telephone asking someone to find an individual named Dennis Lee. The officer also overheard White discussing keys and taking care of her lock box. Later, relying on information provided by McWilliams, police convinced a magistrate judge to issue a search warrant for White's home. When police arrived at White's home they found Michael King who claimed to have just arrived from Chicago. King had a set of keys to the premises in his possession, including a key to a backyard shed. Police confiscated the keys and allowed King to gather his belongings and leave. A search of the premises uncovered a lock box containing $800 cash, a .22 caliber handgun, and approximately 105grams of crack cocaine in the backyard shed. Police gained access to the lock box and shed using keys found among White's personal

belongings.  White was tried and convicted in state court for possession of the twenty-seven grams discovered during the search of the vehicle.

The second incident occurred on September 28, 1997, at approximately 1:09 a.m., when police in Davenport, Iowa, stopped Kevin Horne and discovered approximately thirty-five grams of crack cocaine in his possession.  Horne told police he obtained the crack from White at her apartment approximately 1½ hours earlier and was delivering it for her.  Horne further stated he had been delivering crack cocaine for White for approximately four months.  Police obtained a warrant to search White's apartment and found $3,600 cash but no drugs attributable to White.

The final incident occurred on November 19, 1997, after Rolando D'Sean Nelson agreed to assist police who were investigating White.  At the behest of the police, Nelson arranged a controlled buy of crack cocaine from White.  White picked Nelson up and drove him to her residence.  While at the residence, White sold Nelson approximately one ounce of crack cocaine.  On the return trip, Nelson paid White for crack cocaine she had previously fronted and White agreed to front Nelson an additional ounce of crack cocaine.  Additionally, White and Nelson discussed the possibility of Nelson taking over part of White's drug business; an earlier police raid on White's house; and White's use of a "stash house" to hide crack cocaine.  The police recorded these events on 4½ hours of audio tape.

On January 27, 1998, White was arrested and agreed to talk to police.  White confessed to police she met Mike King through McWilliams and purchased 1/8 kilogram quantities of crack cocaine from him monthly for six months in 1994.  After she was released from state prison in 1995 or 1996, White resumed her dealings with King and by 1997 was again buying crack cocaine on a monthly basis.  White also admitted meeting with King several times in Chicago and the Quad Cities to purchase drugs.

White was indicted and counsel was appointed to represent her. Six days before trial, White wrote the district court asking for a different attorney. The court denied the request. On the first day of trial, White renewed her request complaining she was not being properly represented. The district court again denied the motion, finding White's allegations were insufficient to support her request for new counsel.

The trial lasted three days. The government called twenty-eight witnesses and presented various items of evidence, including White's confession and the tape-recorded statements detailing the sale to Nelson and White's involvement in the drug trade. White's attorney called no witnesses and offered no evidence; he relied exclusively on cross-examination. The jury deliberated less than an hour before returning guilty verdicts on all three counts. White renewed her complaints about counsel's representation and the district court appointed a second attorney to assist trial counsel at sentencing. The second attorney also represented White in her unsuccessful direct appeal. Following the denial of her direct appeal, White filed a pro se § 2255 petition and a public defender was appointed to represent her in the habeas proceedings.

In her habeas petition, White alleged, among other errors, ineffective assistance by trial counsel in all phases of the trial and at sentencing. White also alleged ineffective assistance by the second attorney at sentencing. The district court denied the petition as to all claims except ineffective assistance by trial counsel. The district court, relying on United States v. Cronic, 466 U.S. 648, 659 (1984), concluded trial counsel's performance was sufficiently deficient to be presumptively prejudicial. Alternatively, the court found White had established prejudice under the second prong of Strickland v. Washington, 466 U.S. 668, 694 (1984). The government appeals, arguing the district court misapplied Cronic, trial counsel's performance was not deficient under Strickland, and White failed to establish Strickland prejudice. We reverse.

II

A district court's decision in a habeas claim of ineffective assistance of counsel presents a mixed question of fact and law. Laws v. Armontrout, 863 F.2d 1377, 1381 (8th Cir. 1988) (en banc). We review the ineffective assistance issue de novo, but findings of underlying predicate facts are reviewed under the clearly erroneous standard. Id.

Claims of ineffective assistance of counsel require a showing "(1) that [the] attorney's performance was deficient, falling below professional standards of competence; and (2) that the deficient performance prejudiced [the] defense." Blankenship v. United States, 159 F.3d 336, 338 (8th Cir. 1998) (citing Strickland, 466 U.S. at 687). "In assessing counsel's performance, courts defer to reasonable trial strategies and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Id. (quoting Strickland, 466 U.S. at 689). A showing of prejudice requires a determination by the court that "there is a reasonable probability [sufficient to undermine confidence in the outcome] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (quoting Strickland, 466 U.S. at 694). Courts also consider "whether the result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

There are instances when counsel's errors are so great or the denial of counsel is so complete as to create a presumption of prejudice, eliminating the need to prove Strickland prejudice. Cronic, 466 U.S. at 659. Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential necessarily leads to the conclusion a trial is unfair if the accused is denied counsel at a critical stage of the proceedings. The Supreme Court has repeatedly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the

-5-

proceeding. See, e.g., Geders v. United States, 425 U.S. 80, 91(1976) (holding "an order preventing petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct- and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment."); Herring v. New York, 422 U.S. 853, 864-65 (1975) (holding the refusal to allow defense counsel to make a closing argument was a denial of defendant's constitutional rights); Brooks v. Tennessee, 406 U.S. 605, 613 (1972) (holding "[p]etitioner . . . was deprived of his constitutional rights when the trial court excluded him from the stand for failing to testify first."); Hamilton v. Alabama, 368 U.S. 52, 54-55 (1961) (holding prejudice is presumed when a defendant is arraigned in a capital case without the benefit of counsel and pleads guilty).

Similarly, when counsel completely fails to subject the prosecution's case to meaningful adversarial testing, there has been a denial of Sixth Amendment rights making the adversary process presumptively unreliable. For example, in Davis v. Alaska, 415 U.S. 308 (1974), no showing of prejudice was required because petitioner had been "denied the right of effective cross-examination which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." Id. at 318 (internal quotation and citations omitted).

We will, however, presume prejudice "only when surrounding circumstances justify a presumption of ineffectiveness [,]" Cronic, 466 U.S. at 662, and courts have been appropriately cautious in presuming prejudice. See Scarpa v. DuBois, 38 F.3d 1, 12 (1st Cir. 1994) ("a showing of actual prejudice remain[s] a necessary element in most cases."). When the Supreme Court "spoke in Cronic of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, [it] indicated that the attorney's failure must be complete." Bell v. Cone, 535 U.S. 685, 696-97 (2002). The failure to oppose the prosecution's case must involve the entire proceeding, not just isolated portions. Id. at 697. Apart from circumstances of such magnitude, there is generally no basis for finding a Sixth Amendment violation unless

the accused can show how specific errors of counsel undermined the reliability of the finding of guilt, i.e., Strickland prejudice. Strickland, 466 U.S. at 693-696. The burden of proving ineffective assistance of counsel rests with the defendant. Cronic, 466 U.S. at 658.

The district court's order contains a lengthy discussion of trial counsel's deficiencies. Among the highlights, the district court found counsel failed to conduct any independent investigation in preparing for trial. The district court found counsel's pretrial investigation consisted of an eleven-hour review of more than 500 pages of discovery materials; meetings with White's defense attorney and the prosecutor from the 1995 Iowa state trial; a review the file and transcript from the 1995 state trial; and discussions with White. Counsel made no attempt to update information or evidence developed in the state trial and conducted no interviews of witnesses whose names were contained in the discovery materials or disclosed to him by White. Similarly, despite the fact White was facing a life sentence, counsel did not hire a private investigator or request funding from the court for an investigator. Counsel called no witnesses, offered no exhibits, requested no jury instructions, failed to submit a trial brief, and participated in trial solely through cross-examinations which he did not prepare ahead of time. The district court found counsel's performance sufficiently deficient to compromise the very reliability of the trial process and presumed prejudice, holding the prosecution's case had not been subjected to meaningful adversarial testing.

We accept the district court's findings of fact and assume, without deciding, that counsel's performance was deficient. The government, however, contends that even if counsel's representation was substandard, prejudice cannot be presumed under Cronic, and no Strickland prejudice has been shown. We agree.

We have applied Cronic "very narrowly and rarely have found a situation that justifies application of the presumption of prejudice." Fink v. Lockhart, 823 F.2d

204, 206 (8th Cir. 1987). We recently reaffirmed our narrow application of <u>Cronic</u> in <u>White v. Leubbers</u>, 307 F.3d 722, 729 (8th Cir. 2002). In <u>White</u>, defense counsel in a death-penalty case failed to ask any of the prospective jurors about their views on the death penalty. <u>Id.</u> at 729. Counsel claimed his failure to ask questions regarding the death penalty or to follow up on the numerous questions asked by the prosecutor was a strategic decision intended to keep jurors from focusing on the fact it was a death-eligible case. <u>Id.</u> We found the strategy untenable because it "left the field entirely to the State." <u>Id.</u> at 728. Despite counsel's misguided decision, however, we refused to apply the <u>Cronic</u> presumption of prejudice. "[W]e do not believe that the likelihood of prejudice is inherently so great in the present situation as to justify dispensing with the usual requirement that prejudice must be shown." <u>Id.</u> at 729.

In this case, as in <u>White</u>, we do not believe the <u>Cronic</u> presumption of prejudice applies. Even if we assume counsel's performance was deficient, we cannot say counsel completely failed to participate in the proceedings. Counsel reviewed hundreds of pages discovery materials provided by the government, including numerous summaries of witness interviews conducted by police. Counsel met with White's defense attorney from the earlier state trial and reviewed his file. Counsel also met with the prosecutor from the state trial and reviewed the case file and trial transcript. Before trial, counsel made the standard pretrial motions, e.g., a motion for discovery materials and a motion for disclosure of Jencks Act material. At trial, he participated in the proceedings by making an opening and closing statement and through cross-examination. Because counsel did not completely fail to participate in the proceedings, "the likelihood of prejudice is [not] inherently so great . . . as to justify dispensing with the usual requirement that prejudice must be shown." <u>Id.</u> at 729. Accordingly, we conclude counsel's alleged shortcomings do not rise to the level necessary to presume prejudice under <u>Cronic</u>.

We also disagree with the district court's alternative holding that counsel's deficient performance resulted in <u>Strickland</u> prejudice. White's brief on appeal cites numerous examples of counsel's deficient performance but fails to make a convincing argument showing counsel's representation was so flawed as to undermine confidence in the outcome of the trial.

White first argues she was prejudiced by counsel's failure to call any witnesses to refute the government's claims related to the seizures of crack cocaine on November 12, 1994. White claims she did not own the drugs found in the vehicle or the shed. Instead, White contends there were two sets of keys to the shed and the drugs were put there by either King or McWilliams. Similarly, White contends the vehicle belonged to Kim Lewis and the drugs were put there by someone else. White argues counsel should have called Lewis, King, and McWilliams to prove she did not have exclusive control over the shed or vehicle. Additionally, White argues these witnesses, as well as others, would have advanced her claim of innocence by proving King's and McWilliam's involvement in drug trafficking. Finally, White argues she was prejudiced by counsel's failure to call her mother, Linda White, to testify White did not reside at the address where the drugs were discovered.

We find White's claims of prejudice unconvincing. The record shows Lewis was interviewed by police and told them White owned the vehicle and its contents. McWilliams told police the vehicle was registered in Lewis's name but it belonged to White. These statements directly contradict White's claim and we see no prejudice in failing to present the contradictory evidence.

Additionally, McWilliams told police he had observed crack cocaine in the safe at White's residence and described seeing a .22 caliber handgun in a closet at the same residence. When asked about the events leading up to the traffic stop, McWilliams told police he drove White to a convenience store to buy drugs from Dennis Lee Bailey. White met with Bailey and later, when police stopped the vehicle,

White took drugs out of her bra and hid them under the seat. At the state court trial, McWilliams recanted many of his earlier statements. McWilliams testified he did not know how the crack cocaine got into the car or what White removed from her bra. He further testified he did not know who White met at the convenience store or what transpired. McWilliams continued to acknowledge having seen drugs and a handgun at White's residence but claimed both belonged to King. Despite McWilliams's testimony, White was convicted in state court. Counsel's failure to call McWilliams to testify does not undermine our confidence in the outcome of the trial. McWilliams's testimony was at best contradictory and at worst inculpatory.

As for King, he provided no statement to police and could not be located to testify in the state court proceedings. Nevertheless, White argues she was prejudiced by counsel's failure to find King and present his testimony in the federal trial. We find this claim of prejudice particularly unconvincing. White has provided us with nothing to suggest King could have been located or that he would have provided favorable testimony. Indeed, in our view the opposite is more likely and we will not speculate to the contrary.

Finally, we see no prejudice resulting from counsel's failure to call Linda White to testify. White contends her mother would have testified White did not live at the residence where the drugs were found. Our review of the record, however, shows Linda White testified at the state trial that her daughter resided at the home where the drugs were found. Thus, we are satisfied her testimony on this point would not have been helpful. Moreover, had Linda White testified differently in the federal proceedings she would have been subject to impeachment. In either event, we are satisfied her failure to testify did not prejudice White.

White raises numerous other claims of alleged prejudice, including 1) counsel's failure to call LaKennya March, Tameka Hearn and Cherise Northington to establish an alibi for the events of September 28, 1997, 2) counsel's failure to make a motion

to suppress the crack cocaine seized at her residence on November 12, 1994, 3) counsel's failure to listen to the audio tapes of the controlled buy before trial, and 4) counsel's failure to present evidence showing the $3600 seized on September 28, 1997, represented a personal injury claim settlement and not drug proceeds. Our review of the record satisfies us these alleged errors did not prejudice White. We agree counsel could have done more in defense of White. But the government's case was formidable and we find no "reasonable probability [sufficient to undermine confidence in the outcome] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Blankenship, 159 F.3d at 338 (quoting Strickland, 466 U.S. at 694). The government presented testimony from eyewitnesses connecting White to drug transactions, as well as White's confession and tape-recorded statements detailing her own involvement in drug trafficking. In her confession, White admitted buying crack cocaine from King on a regular basis in 1994 and 1997. She also detailed several trips to Chicago and the Quad Cities to meet King for the purpose of obtaining crack cocaine. In her tape-recorded statements, White is heard negotiating the sale of crack cocaine to Nelson and telling Nelson she will continue to supply him with drugs in the future rather than introduce him to her supplier. White is also heard explaining how she planned to buy drugs but the police raided her house and took her money. In light of this evidence, we cannot say the outcome of the trial would have been different but for counsel's alleged errors. Accordingly, we reverse the district court's grant of relief and dismiss the petition.

III

The judgment of the district court is reversed and the § 2255 petition is hereby dismissed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.