**Jeffrey R. BENZEL, Petitioner,**

v.

**Robert HOUSTON, Respondent.**

No. 4:05CV3264.

United States District Court, D. Nebraska.

April 18, 2008.

◈⇒1959

Jeffrey R. Benzel, Pro Se Petitioner.

James D. Smith, Nebraska Attorney General's Office, Lincoln, NE, for Respondent.

## MEMORANDUM AND ORDER

RICHARD G. KOPF, District Judge.

A judge can fall into the trap of responding to a pro se habeas petitioner's 109–page petition or 154–page brief with an equally tedious missive. Because the ineffective assistance of counsel claims that make up this petitioner's complaints are not hard, I am able to write a relatively short opinion explaining why Jeffrey R. Benzel (Benzel) must serve out his sentences for murder, attempted murder and other serious crimes. In that same vein, my task has been made still easier by the thorough and fair treatment the Nebraska courts have given Benzel's claims.

### I. BACKGROUND[1]

Benzel was convicted by a jury in 1984 of the first degree murder of Terry Atkin-

---

1. The relevant proceedings (including the rec-       ords from the criminal trial, the record of the

son, the attempted first degree murder of Kim Christensen, use of a firearm to commit a felony, and possession of a firearm by a felon. On the murder charge, and rather than impose the death penalty, a three-judge panel imposed a sentence of life in prison. Benzel received additional consecutive prison terms (ranging up to 60 years) on the other three charges.

On direct appeal, the Nebraska Supreme Court reversed the sentence regarding the attempted murder charge because the indeterminate sentence given by the sentencing court (30 to 60 years) improperly set the low-end of the sentence at 30 years rather than required 20 years.[2] Otherwise, Benzel's convictions were affirmed on appeal. *State v. Benzel,* 220 Neb. 466, 370 N.W.2d 501 (1985) *(Benzel I)*, *partially overruled on other grounds, State v. Kuehn,* 258 Neb. 558, 604 N.W.2d 420 (2000).

On December 4, 2002, in an 85–page opinion (filing 23, attachment 3) that followed an evidentiary hearing where Benzel was represented by new counsel, the district court for Hall County, Nebraska denied a motion for post-conviction relief. Benzel appealed. On December 23, 2004, the Nebraska Supreme Court affirmed the denial of post-conviction relief. *State v. Benzel,* 269 Neb. 1, 689 N.W.2d 852 (2004) *(Benzel II )*.

On October 17, 2005, Benzel filed his federal habeas corpus petition. (Filing 1.) Aside from protective arguments about procedural default asserted in the alternative, the respondent does not claim that the petition is untimely or that the Ne-

braska courts have been denied a fair opportunity to consider the petitioner's claims. *Benzel v. Houston,* 2007 WL 295607 * 1 (D.Neb.2007). As a result, and after reminding them of the deferential standard of review, the parties were ordered to brief the merits. *Id.* at *2–3. They have done so. (Filings 47, 55, and 56.)

Save for two pending motions submitted by the petitioner, the matter is now ripe for decision. As I next explain, the pending motions will be denied.

### Petitioner's Pending Motions

■ I deny the petitioner's motion to expand the record (filing 57) under Rule 7 of the Rules Governing Habeas Corpus Cases. The petitioner wants me to consider an affidavit prepared after the filing of this federal case by his expert in pathology (filing 8) even though that expert testified during the evidentiary hearing on Benzel's motion for state post-conviction relief and even though such testimony is in the record. Essentially, the expert reargues his previous testimony. That is, after putting his own spin on the evidence at the post-conviction hearing, the expert seeks to explain why the state district judge was wrong in her evaluation of the expert's testimony.

I deny the motion for two independent reasons. First, Benzel fails to provide a reasoned basis for excusing his failure to present the information contained in the affidavit to the state courts. Between the time of the evidentiary hearing and the time of the judge's opinion, several months passed. Thus, if the petitioner and his

---

evidentiary hearing conducted during the post-conviction proceedings and the briefs and related materials submitted to the Nebraska Supreme Court) are in evidence. *See* primarily filing 23 (attachments 1–28 contained in a "banker's" box; not uploaded to CM/ECF) and filing 52 (attachments 1–7 (also

denominated attachments 29–32 with subparts); uploaded to CM/ECF).

**2.** He was later sentenced again on this charge and received a consecutive sentence of 20 to 60 years. (Filing 1 at CM/ECF p. 3.)

expert thought it necessary to provide "rebuttal" or "supplemental" testimony, they had plenty of time to provide that information. Instead, they waited until after the judge ruled and this federal case was filed. "A habeas petitioner must develop the factual basis of his claim in the state court proceedings rather than in a federal evidentiary hearing *unless he shows* that ... *due diligence* could not have previously discovered the facts." *Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir.2005) (citing 28 U.S.C. § 2254(e)(2)(A)(ii)) (emphasis added). Benzel has failed to make the required showing of diligence.

■ Second, and recognizing that the affidavit is a reformulation of the testimony already given at the evidentiary hearing, Benzel has failed to demonstrate "clearly and convincingly" why the affidavit would make a difference if it were considered. In other words, Benzel has failed to demonstrate why it is probable that the jury would have done something different had they heard the information contained in the affidavit. This failure is fatal to his request to expand the record. *See, e.g., Mark v. Ault*, 498 F.3d 775, 788–789 (8th Cir.2007) (applying Rule 7 and deciding that even if new DNA evidence served to bolster habeas petitioner's claim of constitutional error under *Brady*, petitioner was not entitled to expand the record because he failed to "clearly and convincingly establish" that the new DNA evidence proved that no reasonable fact finder would have found him guilty had it considered that evidence) (citing 28 U.S.C. § 2254(e)(2)(B)).

I also deny Benzel's motion for production of certain state court records. (Filing 61). Since the respondent supplied the requested records (filings 62 and 63), the motion is moot.

## The Crime

The evidence against Benzel, who was previously convicted of crimes and thus prohibited from carrying a gun, was very strong. The jury found that the petitioner shot and killed another man, and threatened to kill a woman. The State asserted that the killing was a drug deal gone wrong in the Grand Island, Nebraska home that belonged to the victims. In addition to Benzel's admission that he killed the dead man with a pistol, Benzel's girlfriend testified that before entering the home Benzel told her he was going to "drop" someone if he did not get what he wanted. The dead man's girlfriend also testified and said Benzel tried to shoot her too after he killed her friend, but the pistol misfired. Benzel also admitted that he fled from the scene, threw the gun into a storm drain, and hid from the police until he surrendered about a day later.

Benzel claimed that he acted in self-defense because the dead man went to his bedroom to retrieve a shotgun and pointed the weapon at the petitioner. Indeed, a shot gun was found near the body. However, when testifying, Benzel made several damaging admissions regarding that defense. For example, before the man got the shotgun, Benzel admitted rushing after him and beating on the door as the man fled into the bedroom.

In *Benzel II*, quoting from and then supplementing its earlier opinion, the Nebraska Supreme Court fairly summarized many of the crucial facts the jury heard:

The evidence reveals the defendant admitted shooting the decedent, Terry Atkinson, with a .357 Magnum on December 12, 1983. According to Lorene Golle, the defendant's girl friend, she, the defendant, and a friend had gone to the Atkinson–Christensen house on December [12] to purchase drugs. Prior to going, Lorene informed the defendant

she had already paid Kim Christensen, the decedent's girl friend, for the drugs the preceding Friday night, December 9, although she admitted in court she actually had not. En route to the house on December 12, the defendant told Lorene, "If I don't get what we came here for, someone's going to get dropped."

When Lorene and the defendant entered the house, Lorene asked to use the bathroom and borrow a brush. Kim showed her to the bathroom and asked what had happened to Lorene, as she appeared to have been beaten around the face. Kim left the bathroom as the defendant approached, wanting to talk to Lorene. The defendant entered, shut the door, and then Kim heard "a racket" in the bathroom, with Lorene shouting and some banging against the walls.

Terry came from the living room and twice told Lorene and the defendant to leave. The defendant grabbed Lorene and started pushing her toward the front door. Before pushing Lorene out, the defendant said he wanted to talk to Kim about being paid for the drugs. After Lorene left, Kim testified the defendant turned, grabbed her, and pointed a gun at her head, which prompted Terry to go to his bedroom where he kept a shotgun. The defendant followed and tried to kick the bedroom door in. When he could not, he returned to the living room, again grabbed Kim and put the gun to her head. He then told her, "Do you want to see something go on here? Do you want to see something happen, huh?" and then, "Better yet," and pointed the gun straight out in the direction of the bedroom, and said, "If your old man comes out and does what I think he's doing, he's going to be a dead man." As the decedent returned from the bedroom, defendant shot him in the mouth, and the victim fell to the floor.

The defendant then stood 5 or 6 feet from Kim, with his legs spread and both hands on the gun straight out "like that," as she crouched by the living room sofa. She heard the gun click and saw it (the cylinder) go around. She heard three more clicks and saw the defendant "looking at the gun like this," and then he ran from the house.

The defendant claims that only after the decedent returned to the living room with the shotgun leveled at him did he pull his gun and shoot the decedent in self-defense.

At trial, Benzel denied having put a gun to Christensen's head or attempting to shoot her. Benzel also testified that at the time he shot Atkinson, Benzel was standing near the front door on his way out of the house rather than sitting next to Christensen on the sofa, as Christensen had testified.

*Benzel II,* 689 N.W.2d at 855–856 (quoting *Benzel I,* 370 N.W.2d at 506) (internal citation to *Benzel I* omitted).

### The Federal Claims of Ineffective Assistance of Counsel

Benzel asserts six claims for relief and all of them center on the allegation of ineffective assistance of counsel. In his brief, the petitioner describes the claims this way: (1) "Trial counsel was prejudicially ineffective by failing to consult with experts or otherwise conduct adequate pretrial investigation ..."; (2) "Benzel was rendered ineffective assistance of counsel in regard to jury instructions ..."; (3) "Defense counsel failed at trial and on direct appeal to challenge evidentiary rulings of the trial court ..."; (4) "Defense counsel failed at trial and on direct appeal to challenge prosecutorial misconduct ..."; (5) "Defense counsel was prejudicially ineffective at trial and on direct appeal in failing to either properly challenge the credibility of key witnesses or effectively

examine key witnesses . . ."; and (6) "Benzel's counsel at trial and on direct appeal was prejudicially ineffective resulting in imposition of unconstitutionally enhanced sentences." (Filing 47 at CM/ECF pp. 1–3.)

Because Benzel had the same lawyers at trial and on direct appeal, his claims of ineffective assistance of counsel were properly first presented in his state post-conviction action described in *Benzel II*. At that time, he was represented by new counsel. In fact, the state district judge ruled that "this post conviction proceeding is the first occasion defendant has had to raise claims of ineffective assistance of counsel." (Filing 23, attachment 3 at p. 3.) The respondent does not argue otherwise. Since Benzel's claims of ineffective assistance of counsel were first addressed in *Benzel II*, and those claims form the basis for the habeas petition, I proceed to a description of that matter next without spending any more time on the direct appeal represented by *Benzel I*.

### Benzel II

It is helpful to separately discuss the proceedings and ruling of the state trial court and the proceedings and ruling of the Nebraska Supreme Court regarding Benzel's motion for post-conviction relief. When one does so, it is evident that the Nebraska courts took their responsibilities very seriously.

### State District Court Proceedings

Benzel filed his motion for post-conviction relief in 1993. He raised issues of ineffective assistance of counsel similar to the ones raised here. Over the years that ensued, various amendments were made, and it was the fourth amended post-conviction petition that ultimately became the operative motion. During the post-conviction proceedings, Benzel was represented by three new lawyers—the local public defender plus two lawyers from the Nebraska Commission on Public Advocacy.[3] In the fall of 2001 and in the spring of 2002, an evidentiary hearing, spanning a total of three days, was conducted before the Honorable Teresa K. Luther, a different judge from the one who presided over the original criminal trial.

On December 4, 2002, the judge issued her 85–page opinion. Judge Luther first described the standard for assessing ineffective assistance of counsel claims, properly focusing on *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[4] She then set out to methodically demonstrate that counsel was not ineffective and that Benzel was not "prejudiced" (as that term is properly understood) by the alleged acts or omissions of trial counsel.

Judge Luther carefully examined the law and the facts regarding trial counsels' failure to hire and call experts in ballistics and pathology and related disciplines.[5] She did the same careful analysis of the law and facts for questions regarding the alleged ineffective assistance of counsel respecting jury instructions,[6] evidentiary issues,[7] prosecutorial misconduct,[8] sufficiency of evidence,[9] cross examination of Ward,[10] cross examination of Christen-

---

**3.** *See, e.g.,* filing 23, attachment 8 at p. 1 (Appearances).

**4.** Filing 23, attachment 3 at pp. 6–7.

**5.** *Id.* at pp. 7–16.

**6.** *Id.* at pp. 17–35.

**7.** *Id.* at pp. 35–48.

**8.** *Id.* at pp. 48–61.

**9.** *Id.* at pp. 61–64.

**10.** *Id.* at pp. 65–67.

sen,[11] cross examination of McCarthy,[12] cross examination of Brush,[13] cross examination of Golle,[14] direct examination of the defendant (failing to have Benzel deny the statement attributed to him by Golle, Benzel's girlfriend, that "If I don't get what we came here for, someone's *going to get dropped*" [15]),[16] failing to interview Lana Benzel,[17] failing to use and investigate the time that the sun set on December 9, 1983,[18] failure to depose Kotschwar,[19] the nature of defense counsel's closing arguments,[20] how counsel handled the habitual enhancement proceedings,[21] and how counsel made oral argument on direct appeal.[22]

There are two issues that arose during the post-conviction proceedings in the state district court that merit additional mention. They relate to the question of "prejudice" and the question of whether Benzel lied about or concealed the whereabouts of the murder weapon. Separately, I discuss those issues next.

### *Prejudice*

In a particularly compelling part of her opinion, Judge Luther emphasized that Benzel's own testimony was "self-damning[.]" (Filing 23, attachment 3 at p. 13.) The judge detailed ten admissions that Benzel made when he testified:

1. He scuffled with Golle [Benzel's girlfriend] shortly before the shooting;

2. When Atkinson told Benzel to leave and started to rise from his chair, Benzel advanced toward him to fight;

3. He chased Atkinson into the bedroom and struck at the bedroom door in an attempt to gain entry;

4. He shot Atkinson using a revolver he had brought with him and had concealed on his person;

5. He fled the Atkinson Christensen residence immediately following the shooting;

6. He purposefully went to the home of McCarthy's sister to avoid apprehension by the police;

7. He then fled Peggy McCarthy's house to avoid apprehension after the 911 operator called and spoke to Joe McCarthy;

8. He hid evidence of his crimes by throwing the murder weapon into a storm drain;

der these circumstances, it is silly to argue that Benzel failed to deny Golle's statement or that his counsel should be faulted for that supposed failure.

11. *Id.* at pp. 67–70.

12. *Id.* at pp. 70–73.

13. *Id.* at p. 73.

14. *Id.* at pp. 73–75.

15. Filing 23, attachment 26 at p. 549. Golle testified that as she and the defendant exited the vehicle to walk up to the home, Benzel made the "drop someone" comment. *Id.* In contrast, when Benzel testified, he said they went to the murder victim's home after Benzel and Golle had a brief conversation about Golle wanting to visit Kim Christensen. Benzel then testified that he said nothing further to Golle. On the contrary, he testified that the two simply walked up to the residence. Filing 23, attachment 27 at pp. 838–839. Un-

16. Filing 23, attachment 3 at p. 75.

17. *Id.* at p. 76.

18. *Id.* at pp. 76–77.

19. *Id.* at pp. 77–78.

20. *Id.* at pp. 78–80.

21. *Id.* at pp. 80–82.

22. *Id.* at pp. 82–84.

9. He spent the rest of the night in a car then went to his sister-in-law's home the following morning; and

10. He knew the police were looking for the killer yet he did not turn himself in until after his sister-in-law, her sister, and a mental health counselor had spoken with him.

(Filing 23, attachment 3 at pp. 13–14).

Benzel does not challenge the accuracy of the judge's description. (Filing 47 at CM/ECF pp. 53–54, 65–67.) Instead, he argues that this "testimony at worst only makes out a case of 'sudden quarrel' manslaughter . . . ." (Filing 47 at CM/ECF p. 67.)

The judge (and the jury) saw it quite differently. Judge Luther concluded that the "jury had before it the riveting testimony of Christensen [the dead man's girl friend and an eye witness]" and "Benzel's own self-damning testimony[.]" (Filing 23, attachment 3 at p. 13.) When put together, that evidence "presented powerful and overwhelming evidence of defendant's guilt and his knowledge of guilt." (Id. at 14.) Consequently, the judge believed that it was "not reasonably probable that the results of the trial would have been different" had defense counsel performed differently. (Id.)

### The Whereabouts of the Gun

During the evidentiary hearing on his post-conviction motion, Benzel's efforts to secure relief were damaged when a substantial question arose about whether he may have lied about or at least concealed the true whereabouts of the murder weapon. At trial, Benzel had repeatedly testified that he threw the murder weapon down a storm drain, although he was vague about precisely where the drain was located. (Filing 23, attachment 27 at pp. 859–860, 871.) At the post-conviction hearing, he testified again that the threw

the gun in a "storm drain" and "nothing that I would tell you today is going to be different than what I testified to at trial." (Filing 23, attachment 9 at pp. 270–271.)

Benzel made much of his counsels' failure to find the weapon and his counsels' related failure to present expert testimony that the weapon would not have misfired as the eye witness testified it had done when she claimed that Benzel tried to kill her. His argument goes something like this: Backed by a properly functioning gun and an expert's testimony about that gun, the eye witness surely lied when she said Benzel tried to shoot her because it is unlikely that the weapon that killed one person moments earlier also misfired three times shortly thereafter. Thus, counsels' failure to find the gun and hire an expert proves ineffective assistance of counsel.

At the evidentiary hearing, one of Benzel's new lawyers called an investigator engaged by the post-conviction legal team to testify about his efforts to locate the gun. Obviously, post-conviction counsel could not fault trial counsel for failing to look for the gun if they failed to do so. The following exchange took place:

Q. Did you attempt to locate a firearm concerning Mr. Benzel's case, more specifically some sort of handgun?

A. Yes, sir.

Q. Who did you talk to about the whereabouts of this handgun?

A. Mr. Benzel.

Q. And was it Mr. Benzel who told you where to go to locate this gun?

A. Yes, sir.

Q. Can you detail the efforts that you went through to try to locate this gun?

A. In visiting with Mr. Benzel, he gave me a location where he believed the weapon to be here in Grand Island, and I checked that area for the

weapon and never came up with one.

(Filing 23, attachment 9 at p. 280.)

In the direct examination of the investigator, there was no mention of the investigator searching for the gun in a park. This was not surprising since Benzel testified he threw the gun into a storm drain.

On cross examination, when pressed for specifics, the investigator told the State's lawyer that he looked in a storm drain "plus also by using a metal detector in the park area." (*Id.* at p. 281.) Surprised by the information about the park, the State's counsel then asked the following questions and received the following answers about why the investigator was searching in the park:

Q. If Mr. Benzel told you he threw the gun in a storm drain, why would you use a metal detector in a park?

A. Because there was a possibility of it being buried in a tree off of Faidley in a vacant lot or a park area.

Q. I don't understand. Why would it be possible it was buried by a tree?

A. Because—

Q. How could that be?

A. The information I had that it was a possibility it could have been buried in the ground by a tree in the soil in a park off of Faidley here in Grand Island.

Q. So let me understand this correctly. The information is that Mr. Benzel told someone else where he threw the gun, and that person buried— retrieved it and buried it?

MR. PICCOLO [Benzel's counsel]: I'll object, Your Honor.

THE COURT: Overruled. He may answer.

A. I'm sorry, would you repeat?

BY MR. JANULEWICZ [The State's counsel]:

Q. The information that came to you, Mr. Benzel told someone else where he had thrown the gun, and that person retrieved it and buried it in the park?

A. Yes, sir.

Q. And who was that person that supposedly did that?

A. A Mr. Slocum.

Q. Did you ever talk to Mr. Slocum about that?

A. Yes, sir.

Q. And what did he tell you?

A. He didn't—did not recall doing that.[23]

(Filing 23, attachment 9 at pp. 281–283.)

Benzel was recalled to the witness stand to explain. In testimony that was, to be charitable, "confused," Benzel essentially said that his investigator's "recollection" was incorrect. (*Id.* at p. 288.) In Benzel's brief, he continues to lay the blame on his investigator's "own faulty recollection. . . ." (Filing 56 at CM/ECF p. 6.)

Benzel's efforts to discredit his trial counsel for failing to locate the murder weapon (and otherwise) were dealt a big blow when his own investigator inadvertently revealed that Benzel may have been less than forthcoming about his knowledge of the whereabouts of the murder weapon. If Benzel was not truthful to his lawyers and the jury about where the gun ended up, it is hard to fault trial counsel for not finding it.

**23.** On redirect examination, the investigator testified that he also talked to a Mr. McCarthy about the same subject and McCarthy told the investigator the same thing that Slocum had told the investigator. *Id.* at p. 284.

### Nebraska Supreme Court Proceedings

The briefing before the Nebraska Supreme Court was very extensive. Benzel's post-conviction counsel filed a 94–page main brief, Benzel, proceeding pro se, filed a 42–page supplemental brief,[24] the State of Nebraska filed an 87–page brief in response, post-conviction counsel filed a 6–page reply brief, and Benzel, appearing again pro se, submitted a 9–page reply brief. (Filing 23, attachment 7 A–E.)

The Nebraska Supreme Court wrote a detailed opinion spanning 14 pages in the reporter. The Court, with Justice Lindsey Miller–Lerman writing the opinion, carefully reviewed each of Benzel's claims. *Benzel II,* 689 N.W.2d at 859–866.

First, regarding the failure to hire and use experts (claim 1 in this court), Justice Miller–Lerman gave the following convincing explanation of why Benzel had not shown prejudice:

> The district court determined that Benzel failed to show that he was prejudiced by trial counsel's purported failure to discover and present such expert testimony. After hearing the evidence, the court discounted the reliability of the expert evidence Benzel presented at the postconviction hearing. The court noted that the opinion of Benzel's expert pathologist regarding the trajectory of the bullet was based solely on a review of autopsy reports and photographs and testimony presented at the original trial and that the expert relied on his own speculation rather than the findings of the pathologist who conducted the autopsy. The court also noted that Benzel's expert testified only that the misfiring of the gun when Benzel allegedly attempted to shoot Christensen was

"highly improbable." The expert conceded that the gun itself would need to be examined to better support either version of events, but Benzel had disposed of the gun after the shooting and it had never been found. The court further noted that the State presented expert testimony at the postconviction hearing regarding bullet trajectory which supported Christensen's story and contradicted Benzel's and that both at trial and at the postconviction hearing, the State presented expert testimony that various circumstances could have caused the gun to misfire as Christensen had described. The court noted the "powerful and overwhelming evidence of [Benzel's] guilt" that was presented at trial and concluded that Benzel had failed to show prejudice due to trial counsel's purported failure to develop and present expert testimony.

Benzel argues, inter alia, that it was not appropriate for the district court to weigh the credibility of the expert testimony he presented in the postconviction hearing, that instead the court should have decided that such evidence should be presented to a jury in a new trial, and that the jury should have been allowed to give whatever weight it chose to the testimony. However, we have held that in an evidentiary hearing for postconviction relief, the postconviction trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and the weight to be given a witness' testimony. *State v. McDermott,* 267 Neb. 761, 677 N.W.2d 156 (2004). Therefore, it was not inappropriate for the district court to assess the credibility and weight of the expert testimony

---

24. As the files in this case will demonstrate, Benzel is a prolific brief writer. His briefs are also very well written. They display a legal sophistication seldom seen in pro se litigants.

presented in this postconviction evidentiary hearing. Furthermore, the district court considered such testimony in the context of determining whether failure to develop such testimony and present such evidence constituted ineffective assistance of counsel. A defendant claiming ineffective counsel must demonstrate, inter alia, a reasonable probability that but for counsel's deficient performance the result of the proceeding would have been different. *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004). The district court in this case examined the expert testimony presented by Benzel in the postconviction evidentiary hearing and appropriately determined that the expert testimony was not of a nature that it would have caused a different result. We find no error in the district court's determination that Benzel failed to establish prejudice resulting from trial counsel's failure to develop and present such evidence, and we therefore reject this claim of ineffective assistance of counsel.

*Id.* at 860.

Regarding claim 2 in this court, an allegation that counsel was ineffective for failing to properly deal with jury instructions, the Nebraska Supreme Court carefully dissected that claim. *Id.* at 860–862. In particular, the court observed that the self-defense instruction was taken from the Nebraska pattern jury instruction book. *Id.* at 861. In general, the court concluded:

> We have examined each of Benzel's arguments related to jury instructions and determine that the district court did not err in ruling that Benzel has failed to establish his claims of ineffective assistance of counsel with respect to these jury instruction issues. Defense counsel is not ineffective for failing to object to

jury instructions that, when read together and taken as a whole, correctly state the law and are not misleading. *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004). In this regard, we note that we have stated that a defendant convicted of first degree murder could not have been prejudiced by error in the instructions on second degree murder and manslaughter because under a step instruction, the jury would not have reached the issues of second degree murder and manslaughter. *State v. Bao*, 263 Neb. 439, 640 N.W.2d 405 (2002). We agree with the district court's determinations that certain of the jury instructions questioned by Benzel correctly stated the law and were not misleading and that therefore trial counsel was not ineffective for failing to object to such instructions. We also agree that Benzel has not established that he was prejudiced by the giving or failure to give any of the questioned jury instructions. The district court therefore did not err in rejecting these claims of ineffective assistance of counsel.

*Id.* at 862.

Regarding claim 3 in this court, a complaint about counsel failing to challenge specific evidentiary rulings, Justice Miller–Lerman carefully examined each instance and found either that Benzel failed to show prejudice or the grounds for the objection that Benzel thought was necessary did not exist. *Id.* at 862–864.

Regarding claim 4 in this court, a complaint that counsel failed to object to prosecutorial misconduct, the Nebraska Supreme Court carefully examined each instance of alleged misconduct. The Nebraska Supreme Court agreed with Judge Luther that no prejudice had been shown. *Id.* at 864–865.

Regarding claim 5 in this court, an argument that counsel failed to properly handle

the examination of key witnesses, the Nebraska Supreme Court closely reviewed Benzel's claims. The Court concluded:

> The district court in this postconviction action generally determined that counsel made reasonable tactical and strategic decisions to not pursue the lines of questioning suggested by Benzel and noted that such questioning may have led to information adverse to Benzel.
>
> In determining whether trial counsel's performance was deficient, there is a strong presumption that such counsel acted reasonably. See *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004). When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. *Id.* The district court did not err in its determination that trial counsel made reasonable strategic decisions to not pursue the lines of questioning suggested by Benzel in this postconviction proceeding. We therefore conclude that the district court did not err in rejecting these claims of ineffective assistance of counsel.

*Id.* at 865.

Finally, the Court took up the claim that defense counsel were ineffective for their handling of the "habitual criminal" enhancement proceedings. That argument is claim 6 in this proceeding. The Court ruled that because Benzel was represented by counsel at the time of the prior convictions, his trial counsel in the murder case could not successfully challenge those earlier convictions under Nebraska law because such challenges had to have been made in a direct appeal at the time of the original prior conviction. Thus, trial counsel in the murder case could not have been ineffective for their handling of the enhancement proceedings since there was no way the lawyers could have challenged the prior conviction under Nebraska law beyond requiring the prosecutors to prove the existence of the prior convictions at the enhancement hearing. *Id.* at 865–866.

In *Benzel I*, the Nebraska Supreme Court carefully examined the question of whether sufficient evidence, properly authenticated, had been presented by the prosecution at the enhancement hearing. *Benzel I*, 370 N.W.2d at 508–509. The Court found that properly authenticated evidence of two prior convictions (showing that Benzel had been represented by counsel) had been offered and received into evidence. *Id.*

## II. ANALYSIS

First, I state the standard of review that governs my handling of this federal habeas corpus case. Next, I set out the substantive law on ineffective assistance of counsel claims. Finally, I turn to Benzel's claims and explain, albeit briefly, why they lack merit.

### The Standard of Review

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the facts and the law. *See* 28 U.S.C. § 2254(d).

With regard to the deference owed to factual findings of a state court's decision, a federal court is bound by those findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

With regard to the deference owed to the conclusions of law, a federal court may not grant a writ of habeas corpus unless the state court's legal conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### Ineffective Assistance of Counsel Claims in Federal Habeas Cases

In general, to be eligible for habeas relief based on ineffective assistance of counsel, a petitioner must meet the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ He or she must first establish that counsel's representation was constitutionally deficient, which requires a showing that counsel's performance fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. 2052; *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Because of the " 'distorting effects of hindsight,' " there is highly deferential scrutiny of counsel's performance and the courts indulge " 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Link v. Luebbers*, 469 F.3d 1197, 1202 (8th Cir.2006), *cert. denied*, —— U.S. ——, 128 S.Ct. 488, 169 L.Ed.2d 344 (2007) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

■ If the claimant establishes the first element, the petitioner must then show that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. This requires proving that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to the petitioner. *Id.* at 694–695, 104 S.Ct. 2052.

A reasonable probability is one "sufficient to undermine confidence in the outcome." *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527. Merely showing a conceivable effect is not enough. *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 2256, 167 L.Ed.2d 1099 (2007).

It is also true that "review of the state court determination that [the petitioner] has not proved an ineffective assistance of trial counsel claim ... is 'twice deferential: we apply a highly deferential review to the state court decision; the state court, in turn, is highly deferential to the judgments of trial counsel.' " *Link*, 469 F.3d at 1202 (quoting *Nooner v. Norris*, 402 F.3d 801, 808 (8th Cir.2005)). Thus, when a state court has carefully examined and then denied a claim of ineffective assistance of counsel, a subsequent federal challenge is likely to fail.

### The Experts Claim

■ Regarding Benzel's primary argument, asserted in claim one, that his lawyers were ineffective in failing to hire and use experts, the petitioner has not come close to overcoming the deferential standard of review that I must employ. The state courts found that Benzel was not prejudiced by his lawyers' alleged malpractice, and that determination is plainly entitled to deference. *See, e.g., Hoon v. Iowa*, 313 F.3d 1058, 1061–1062 (8th Cir. 2002) (reversing federal district judge's contrary ruling; stating that under the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal habeas court must give substantial deference to the state court's analysis of the evidence; holding that state appellate court's decision that defense counsel's deficient performance in failing to object to admission of co-defendant's confession did not prejudice petitioner, in a prosecution for robbery, in light of other evidence of petitioner's guilt,

was not an objectively unreasonable application of the *Strickland* federal ineffective assistance of counsel standard, as required to support habeas relief under AEDPA); *Siers v. Weber,* 259 F.3d 969, 973–975 (8th Cir.2001) (reversing federal district judge's contrary ruling; holding that South Dakota Supreme Court's determination that habeas petitioner suffered no prejudice was entitled to deference even though counsel failed to interview alibi witnesses and called no witnesses on behalf of the defendant in a sexual assault case; the South Dakota Supreme Court reasonably determined that the jury would not likely have found the witnesses credible, physical evidence of a forcible rape was overwhelming, and only witness not subject to impeachment on the basis of bias placed petitioner and victim together immediately after rape).

Essentially, Benzel argues that his lawyers could have found a pathologist to testify that it was unlikely that Benzel shot the decedent from the position described by the decedent's girlfriend. Additionally, he argues that a ballistics expert might have testified that it was unlikely that the weapon misfired as the woman claimed. Continuing with his argument, Benzel asserts that such expert testimony would have undermined the credibility of the lone eye witness to the shooting and the alleged victim of the attempted murder. Thus, so the argument goes, his lawyers badly erred in failing to employ and use experts to further the defense.

However, and among other things, Benzel entirely ignores the evidence presented by the State at the post-conviction hearing.[25] The prosecution presented extremely strong evidence that experts employed by Nebraska would have supported the bulk of the eye witness testimony had expert testimony been used by the defense to attack that witness's credibility. *At the very best,* the evidentiary hearing record established that experts hired by the State and experts hired by the defense would have dueled to draw leaving the jury to assess credibility on less esoteric and more customary grounds.[26] Given the ten admissions that Benzel made at trial, coupled with the statement attributed to him by his own girlfriend that he would "drop" someone if he did not get what he wanted, I agree with the Nebraska courts that there is no reasonable probability that expert testimony would have harmed the credibility of the eye witness to a degree sufficient to change the outcome for Benzel. *See, e.g., Cagle v. Norris,* 474 F.3d 1090, 1097 (8th Cir.2007) (in a murder case tried to a jury, ineffective assistance of counsel and prejudice were not established where defense counsel failed to present

---

**25.** *See, e.g.,* filing 23, attachment 8 at pp. 80–109 (testimony of Dr. Jerry Jones, a physician who was board certified in forensic pathology) and filing 23, attachment 9 at pp. 341–382 (testimony of Mark Bohaty, a sergeant with the Highway Patrol and a firearms and tool mark examiner).

**26.** There was, of course, a significant risk to the defense about starting a war of experts. As the evidence at the post-conviction hearing amply demonstrated, it was quite possible that the State's case would have been made even stronger had the defense decided to base its credibility attack on the strength of expert testimony that "had been bought and paid

for." For example, consider the testimony of Sergeant Bohaty regarding the video taped experiment he conducted in 2001 showing a similar weapon misfiring after first successfully firing. (Filing 23, attachment 9 at pp. 350–355.) Remembering not to judge trial counsel by hindsight, a credible argument can be made that they were wise in keeping the defense simple and straightforward. As evidenced by the problem Benzel ran into at the post-conviction hearing about where he stashed the murder weapon, things have a way of backfiring when defense lawyers "get too cute."

expert evidence on effects of methamphetamine intoxication by decedent in support of defendant's self-defense claim).

■ Benzel seems to argue that he need not show prejudice, and the Nebraska courts erred by requiring such a showing because this is one of those cases where prejudice is not required. In other words, he implies that prejudice should be presumed. But, as the Eighth Circuit has recently said,

> We rarely presume prejudice in ineffective assistance of counsel cases. *United States v. White*, 341 F.3d 673, 679 (8th Cir.2003). In *White*, counsel failed to conduct any independent investigation of the case. *Id.* at 678–79. Further, "[c]ounsel called no witnesses, offered no exhibits, requested no jury instructions, failed to submit a trial brief, and participated in trial solely through cross-examinations which he did not prepare ahead of time." *Id.* at 678. Even so, counsel otherwise participated in the case as an attorney, and therefore the defendant was not completely without counsel. *Id.* at 678–79. We did not presume prejudice in *White*, and we rejected White's claim that she was prejudiced by counsel's failure to call witnesses, *concluding that there was no reasonable probability that the result of the proceeding would have been different had they been called. *Id.* at 679–80.

*Malcom v. Houston*, 518 F.3d 624, 627 (8th Cir.2008) (in a sexual assault case, prejudice would not be presumed even though counsel erroneously conducted the defense as if consent and mistake of age were valid defenses or lesser included offenses).

Whatever deficiencies that Benzel may rightly or wrongly assign to his trial counsel, the two lawyers who represented him certainly performed well enough to avoid any suggestion that prejudice may be presumed from their representation. They vigorously defended their client. They hired an investigator, deposed witnesses, filed motions, wrote briefs, cross-examined witnesses at trial, called witnesses for the defense and made arguments to the jury. They avoided the death penalty and they secured a reduction of one of the sentences on appeal. In short, Benzel cannot get around the prejudice requirement. Having failed to do so, he loses.

### The Other Claims

Save for two observations, it is sufficient to state that the detailed decisions of the Nebraska courts deserve deference on all of Benzel's other claims. That is, there is no federal basis to overturn them and nothing more needs to be said despite Benzel's prolix arguments to the contrary. *See* 28 U.S.C. § 2254(d). Now, to the two observations.

■ First, Benzel takes exception to the Nebraska courts' citation to Nebraska law, instead of federal law. He implies that because those courts cited Nebraska law, no deference is due those decisions. That argument is simply wrong. *See, e.g., Jeremiah v. Kemna*, 370 F.3d 806, 809 (8th Cir.2004) (deferential standard of review applies to federal habeas review of state court decision even if the state court fails to cite any federal cases in its analysis, so long as the state court addresses and rules on the merits of the constitutional claim rather than on procedural grounds).

■ Second, Benzel views the facts in the light most favorable to him, and then he argues that the Nebraska courts are wrong because they did not do likewise. For among several other reasons, this method of argumentation is unavailing because the petitioner has not rebutted the presumption of factual correctness by "clear and convincing" evidence as required by federal law. *See* 28 U.S.C. § 2254(e)(1). A credulous judge *might* see the evidence as Benzel sees it, but that is not the test.

### III. CONCLUSION

By his own admission, Benzel, a felon, went into a man's home with a gun, rushed at the man and then shot the man to death. Based on the fair and thorough work of the Nebraska courts, the petitioner will suffer the consequences for the rest of his life.

IT IS ORDERED that:

1. The motion to expand the record (filing 57) and the motion for production of documents (filing 61) are denied.

2. The petitioner's petition for habeas corpus is denied with prejudice. A separate judgment will be entered.

### JUDGMENT

Based upon the memorandum and order entered this date,

IT IS ORDERED that judgment is entered in favor of the Respondent and against the Petitioner, Jeffrey R. Benzel, providing that Benzel shall take nothing and his petition for writ of habeas corpus is denied and dismissed with prejudice.